In the Matter of The **CENTRAL RAIL-ROAD COMPANY OF NEW JERSEY, Debtor,**

v.

**MANUFACTURERS HANOVER TRUST COMPANY,** Trustee of the General Mortgage which secures the General Mortgage Bonds of the Debtor, Appellant.

No. 17937.

United States Court of Appeals, Third Circuit.

Argued Nov. 18, 1969.

Decided Jan. 19, 1970.

Rehearing Denied Feb. 18, 1970.

Roger C. Ward, Pitney, Hardin & Kipp, Newark, N. J., for appellant.

Charles J. Milton, Milton, Keane & DeBona, Jersey City, N. J., for trustee of property of The Central Railroad Co. of N. J. (William F. Tuohey, Jersey City, N. J., on the brief).

Before HASTIE, Chief Judge, and VAN DUSEN and ADAMS, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This is an appeal from a district court order of March 26, 1969, authorizing the Reorganization Trustee of the Central Railroad Company of New Jersey to pay for the removal of a damaged portion of the Newark Bay Drawbridge with funds drawn down from a special account held for the benefit of the Railroad's bondholders.[1]

On March 22, 1967, the district court granted the petition of the Central Railroad Company of New Jersey for reorganization, pursuant to § 77 of the Bankruptcy Act, 11 U.S.C. § 205 (1964). On October 13, 1967, the court established Special Account No. 3 for the protection of the holders of The General Mortgage bonds, into which all proceeds from the disposition of real property subject to such mortgage, for amounts exceeding $10,000. were to be placed. Special Account No. 3 "is the account in which the Trustee deposits all proceeds of sale, salvage or other disposition of real property covered by the lien of the Debtor's General Mortgage (except items involving $10,000.00 or less in any one transaction), which proceeds are normally withdrawable by the Trustee to pay for needed additions and betterments to, or the purchase of, other real property, which would be or become subject to the lien of the General Mortgage."

The order challenged in this appeal authorized payment for the removal of a damaged span of the Newark Bay Drawbridge, which is the Railroad's only rail link between Bayonne—Jersey City (parts of the Port of New York) and the remainder of its system. On May 19, 1966, the Steamship *Washington* collided with the Drawbridge, rendering both the north and south spans inoperative. Approximately $214,000. was expended by the Railroad to make the south span operative, and $49,000. was expended to support the north span which was left in a raised position; additional work on the south span at an estimated cost of $216,000. was deferred. In addition, because of the necessity to reroute its rail traffic while the south span was being repaired and the loss of revenue incurred during this period, the Railroad suffered $192,000. in consequential damages. On September 10, 1968, the court approved a settlement of $750,000., in full satisfaction of the Railroad's claims arising from the *Washington's* collision with the bridge.[2]

Following the settlement it was determined that there was no further need for the north span and that the support to such span added after the collision

---

1. The order provided:
"[T]he Court concludes that the Trustee is authorized to enter into a contract * * * for the removal and disposition of the damaged portion of the north span of the Newark Bay Drawbridge, and to draw upon the funds in Special Account No. 3 for the payment of the same."

2. The court allocated approximately $455,000. of the $750,000. to expenses and consequential damages actually incurred by the Railroad. The remaining $295,000. received by the Reorganization Trustee was placed in Special Account No. 3, as partial compensation to the holders of the mortgage bonds, reflecting the difference between the pre-collision value of the Drawbridge and its value after being damaged and repaired. No part of the settlement was allocated to anticipated repairs of the south span.

was insufficient protection against the possibility of its collapse. If it continued to stand in its weakened condition, it would be a hazard to navigation on the river below and to the south span of the Drawbridge next to it. The Reorganization Trustee therefore advertised for bids for the removal of the damaged portion of the north span. The low bid was $385,000., an offer that was open to acceptance only until March 31, 1969. Related costs of the Railroad raised the total amount necessary for removal to $408,000. On January 21, 1969, the Reorganization Trustee petitioned the court for authority to accept the offer, the total cost of $408,000. to be drawn from Special Account No. 3.

The district court found that the expenditure would be for a "betterment to the economic and efficient operation of the railroad,"[3] since it was necessary for the preservation of the south span and to the continued operation of the Railroad. It also found specifically that (1) there was "an immediate and urgent need" for the removal of the damaged portion of the north span, (2) no sources other than Special Account No. 3 were available to meet this need, (3) reorganization of the Railroad was "probably feasible," and (4) the interests of the bondholders would not be prejudiced by granting the petition. Accordingly, the court authorized the Reorganization Trustee to enter into the contract for removal and to draw upon the funds in Special Account No. 3 for this purpose. No obligation to repay the $408,000. was imposed.[4]

■ Under the Bankruptcy Act, the Reorganization Trustee is vested with the right to immediate possession of all the debtor's property. Bankruptcy Act § 257, 11 U.S.C. § 657 (1964). The incidents of this right, however, are not unlimited. The right of the trustee to the use of property to which a lien attaches, such as the funds in Special Account No. 3, to finance betterments was described by Judge Anderson in In re New York, New Haven & Hartford Railroad Co., No. 30226 (D.Conn., 12/7./61):

> "The rule for a reorganization under Sec. 77 * * * is that in addition to finding that the funds are presently needed and cannot be obtained elsewhere the court need only conclude that reorganization is probably feasible, that the money drawn-down and expended for additions and betterments will materially contribute to the possibility of successful reorganization and to the continuation of the transportation plant, or a substantial part thereof, as a going concern, and that the interests of the bondholders are not thereby prejudiced." (Appellant's brief, at 28).

Similar factors are considered in Chapter X reorganizations, if the mortgaged property is to be expended to finance betterments. See, e. g., Harding v. Stichman, 240 F.2d 289 (2nd Cir. 1957); Reconstruction Fin. Corp. v. Kaplan, 185 F.2d 791 (1st Cir. 1950).

■ The funds taken from Special Account No. 3 in this case, however, were not expended for "additions or betterments."[5] They were expended to remove

---

3. The district court used this language: "It may be argued that this expenditure is not for a 'betterment' in the classic sense of the word; however, this Court has no doubt that the expenditure is necessary for the preservation of the property of this estate; it is, therefore, a betterment to the economic and efficient operation of the railroad."

4. The Indenture Trustee did not move for a stay of the order, and the contract was executed before the March 31, 1969, deadline. At the time of argument be-

fore this court, the contract had been completed and the entire $408,000. had been drawn down from Special Account No. 3.

5. We note that under circumstances such as these, where the findings are of ultimate, rather than evidentiary, facts and are in the nature of conclusions, the limits of Rule 52(a) of the Federal Rules of Civil Procedure on the scope of appellate review do not apply. See, e. g., Soles v. Franzblau, 352 F.2d 47 (3rd Cir. 1965); Stevenot v. Norberg, 210 F.2d 615 (9th Cir. 1954).

mortgaged property, not to replace or add to it. Certainly the expenditure inured to the benefit of the bondholders, since removal of the damaged portion of the Drawbridge protected the operative south span, thus insuring that the Railroad would not suffer another stoppage of service. And there is no doubt that the "going concern" value of the Railroad to the bondholders was greater than its liquidation value, had a stoppage of service prevented reorganization. But like insurance or any other expenditure that keeps the Railroad operating, this was an operating expense.[6] The crucial consideration in classifying an expenditure as being for an addition or betterment is whether such expenditure increases the value of mortgaged property by adding to the operational plant.[7] In this case, the Reorganization Trustee was authorized to draw $408,000. from the bondholders' account; the Indenture Trustee, representing the holders of the General Mortgage bonds, was given no substitute property in exchange and no property under lien was increased in value through physical additions thereto.

The expenditure was not for "an addition or betterment." [8]

The leading case in a situation where the trustee is authorized to draw down mortgaged funds to pay for operating expenses is In re Third Avenue Transit Corp., 198 F.2d 703 (2nd Cir. 1952). The Indenture Trustee appealed from an order authorizing the Reorganization Trustee to draw down $500,000. from the mortgaged funds account[9] for "working capital" in order "to continue operations." *Id.* at 705.[10] In return, the Indenture Trustee received from the Reorganization Trustee a certificate bearing 1¾% interest, the times and amounts of repayment to be settled by further court order on the application of either party. The Second Circuit established the test for such an order:

"[T]he court's far more drastic power under Section 257 [to authorize the reorganization trustee to take possession of any or all property of the debtor], requires proof of the most extraordinary circumstances * * *. [W]e believe that that power should

6. The parties apparently stipulated that the Interstate Commerce Commission would classify the expenditure for removal and disposal of the damaged span as an operating expense under its Uniform System of Accounts for Railroad Companies.

7. Thus, in the *New Haven case, supra,* the expenditure involved "money for the repair facility at Stamford, the trestle at Bridgeport, the freight house at Stamford * * *." In Harding v. Stichman, *supra,* the railroad purchased new railroad cars. In Reconstruction Fin. Corp. v. Kaplan, *supra,* the court allowed the trustee to complete the manufacture of unfinished watches so that they could be sold for the Christmas season, thereby increasing the total property of the debtor. The court in In re New York, N. H. & H. R. R., 289 F.Supp. 451, 455 (D.Conn. 1968), allowed the debtor to continue deficit operation, but the deficit did not involve the expenditure, without substitution, of mortgaged property. The order in that case of December 19, 1967, cited by appellee, did allow the disbursement of mortgaged funds for operating expenses,

but only on the condition that the United States Government substitute property with a value equivalent to that withdrawn.

8. The Reorganization Trustee made no showing that the value of the bridge structure without the damaged north span was greater than the value of such structure with the damaged span in place. At the time of the settlement, it was estimated that repairs necessary to put the north span in operative condition would cost $700,000. The court's order leaves the Indenture Trustee with a bridge of uncertain value and a cash fund diminished by $408,000.

9. The account consisted of proceeds from the sale of mortgaged real property, similar to Special Account No. 3.

10. The court characterized the draw-down as cash that "could be readily dissipated by improvident trustees, leaving the bondholders nothing of any substantial value in return." 198 F.2d at 706, n. 7. In contrast, the operating expense in the instant case was carefully examined and limited.

never be exercised absent findings, based on the clearest evidence, not only that it is imperative to obtain the funds and that they cannot be obtained * * * through ordinary market channels * * * but also that there is a high degree of likelihood (a) that the debtor can be reorganized in accordance with the Act, within a reasonable time, and (b) that the secured creditors whose security is being compulsorily loaned will not be injured. The reorganization trustees here had the burden of proving all these matters." *Id.* at 706–707 (footnotes omitted).

Because the district court had made no such findings and because no evidence was introduced to support such findings, if made, the order was reversed.

■ Although the district court in the instant case made findings, its findings complied with the test set forth by Judge

Anderson in the *New Haven* case, *supra*, not the stricter test set forth by the Second Circuit in the *Third Avenue* case, *supra*.[11] We need not determine, however, whether the § 77 standard applied in *New Haven* to betterments or the Chapter X standard applied in *Third Avenue* to operating expenses should be applied to this case, a § 77 reorganization involving the draw-down of mortgaged funds for operating expenses. The Indenture Trustee does not contend that no funds should have been drawn down from Special Account No. 3;[12] it contends only that some obligation be imposed upon the Reorganization Trustee to repay the compulsorily lended funds to Special Account No. 3. We agree.

Prior to the district court's order, the Indenture Trustee possessed a mortgage lien upon the funds in Special Account No. 3. This bondholders' lien had priority over the claims of operations creditors.[13] The order, however, released

---

11. The district court found only that reorganization was "probable" and that the bondholders would not be "prejudiced" by the order. *Third Avenue*, however, requires a finding of a "high degree of likelihood" of reorganization and of noninjury to the bondholders. As Judge Anderson stated in the *New Haven* case, *supra*,

> "These criteria [in the *Third Avenue* case] * * * appear to call for a finding by the court, as prerequisite to a granting of leave to the trustees to draw-down funds from the registry of the court for working capital, that there exists *almost absolute certainty* of successful reorganization and *almost a guaranty* that no loss will be suffered by the bondholders by reason of the draw-down." (Emphasis added) (Appellant's brief, at 26)

Cf. In re Riker Del. Corp., 385 F.2d 124, 126 (3rd Cir. 1967), where this court, dealing with a Chapter X reorganization of a corporation holding real estate, stated that the secured creditors, in return for a turn-over order, should expect a "real prospect of compensating advantage * * * through a successful reorganization."

12. The Indenture Trustee argues that the district court was clearly erroneous in finding that no source of funds was available for the removal and disposal of the

damaged north span, because it was willing to lend the required funds out of its holdings in Special Account No. 3. This argument misconstrues the nature of the *Third Avenue* and *New Haven* proceedings. The issue in both those cases was whether funds should be drawn from the account of the bondholders. Both courts held that such a draw-down was impermissible if funds could be obtained from sources *other* than the account of the bondholders. It is conceded here that there were no sources of funds other than those in Special Account No. 3, and therefore the test of unavailability of outside funds was met.

13. Judge Anderson provided an excellent discussion of the law regarding creditor priority in In re New York, New Haven & Hartford Railroad, 278 F.Supp. 592 (D.Conn.1967). That case involved the claim of operations creditors whose claims had arisen in the period immediately preceding reorganization. The court recognized the general rule that operations revenues must go first to those who keep the railroad running, the operations creditors:

> "Revenues accruing from operations should be paid first to the operations creditors whose materials and services made those revenues possible; and only after such operational claims have been paid should the balance be available for

$408,000. from the bondholders' lien, thus making that amount available to satisfy the priority of operations creditors.[14] Equity demands that the bondholders be given a guaranty that their lien upon this money be maintained, and that the money be repaid as soon as reasonably possible. Cf. In re Riker Del. Corp., 385 F.2d 124, 125 (3rd Cir. 1967).

Therefore, the District Court order of March 26, 1969, will be reversed and that court will be directed to enter an order

(1) imposing upon the Reorganization Trustee an obligation in favor of the Indenture Trustee, ranking on a parity as to lien and priority with any other obligations (except Trustee certificates approved by the Interstate Commerce Commission) heretofore or hereafter incurred by the Reorganization Trustee, for repayment of the $408,000. principal drawn-down from Special Account No. 3, in such instalments as the District Court shall determine to be reasonable, any part of such $408,000. principal so repaid to have the same status as other funds in Special Account No. 3;

(2) providing for interest payments on all of the above-mentioned $408,000. from the date or dates of its payments by the Indenture Trustee and on such parts of this $408,000. as have not been repaid in the future at such rate as the District Court shall determine from time to time, but in no event shall such rate be less than the average rate of return on the principal funds within Special Account No. 3,[15] the obligation to pay such interest ranking on the same parity as to lien and priority as is specified in (1) above; and

(3) providing that the interest paid on the above-mentioned $408,000. and parts thereof, prior to repayment of the principal producing such interest, shall be income of the Indenture Trustee.[16]

---

the benefit of the mortgages. If any operating revenues do improperly get into the hands of the mortgagees, equity requires that those revenues be restored to the operations creditors by the mortgagees yielding them a priority." *Id.* at 597–598.

The principle of this priority, however, applies only to operations revenues. Property subject to mortgage liens, or "corpus," *id.* at 595 n.1, "cannot be invaded to satisfy the priority of the operations creditors." *Id.* at 602. This latter rule does not apply if operations expenses have been "diverted" to the benefit of the bondholders, but "benefits accruing to the bondholders" is defined as *not* including benefits paid for by "proceeds from sales of mortgaged property." *Id.* at 603–604.

14. See, *e. g.*, Pennsylvania Steel Co. v. New York City R. R., 216 F. 458, 471 (2nd Cir. 1914), cert. den. 238 U.S. 632, 35 S.Ct. 794, 59 L.Ed. 1498 (1915); In re New York, N. H. & H. R. R., *supra*, note 13, at 602.

15. In the *Third Avenue* case, *supra*, the lower court had ordered repayment of the compulsory loan with 1¾% interest. In holding that the loan was improper, the court stated:

"Although our decision here would be the same in the absence of the following facts, we think it important that they be noted: (1) The terms of the certificate issued to the involuntary lender— i. e., the noncommercial interest rate and the lack of a fixed maturity date— were peculiarly unfortunate. * * *" 198 F.2d at 707, n. 15.

16. At oral argument counsel indicated that there is some dispute over whether the interest presently accruing on the funds in Special Account No. 3 should be paid to the Reorganization Trustee. While we make no resolution of that dispute, we think it proper that, in order to encourage prompt repayment of the $408,000., the Reorganization Trustee's obligation to pay interest on the $408,000., which will be receivable as income of the Indenture Trustee, should be clear.