657 F.2d 570
 In the Matter of the LEHIGH AND NEW ENGLAND RAILWAY COMPANY, Debtor.
United States of America, Erie Lackawanna, Consolidated Rail
Corporation, Intervenors in D.C.
Appeal of CENTRAL JERSEY INDUSTRIES, INC.
 No. 80-2577.
 United States Court of Appeals,
Third Circuit.
 Argued May 21, 1981.
Decided Aug. 3, 1981.
 
 William R. Glendon (argued), Donald F. Luke, Rogers & Wells, New York City, for Committee of Interline Railroads, appellee; John B. Murray, Connell, Foley & Geiser, Newark, N. J., of counsel.
 Janet L. Ries, Philadelphia, Pa., for Consolidated Rail Corporation, appellee.
 Lamb, Hutchinson, Chappell, Ryan & Hartung, Jersey City, N. J., for Thomas F. Patton and Ralph S. Tyler, Jr., Trustees of Erie Lackawanna Railway, respondents; Raymond J. Lamb, Jersey City, N. J., of counsel.
 Carpenter, Bennett & Morrissey, Newark, N. J., for Central Jersey Industries, Inc., appellant; Stanley Weiss, Jerome E. Sharfman (argued), Newark, N. J., of counsel.
 Before GIBBONS, HUNTER and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge:
 
 
 1
 This appeal requires us to determine a question of first impression: once a railroad has gone into receivership and has expended all of its general funds, may the balance of unpaid interline claims be paid out of mortgaged assets prior to the satisfaction of the mortgage bondholder's secured claims?[1]
 
 
 2
 This issue was presented to the United States District Court for the District of New Jersey on motion of the Receiver of The Lehigh and New England Railway Company ("L&NE") for an order approving a plan of liquidation. The court initially approved certain modifications to the Plan, but reserved its decision on the issue which constitutes the heart of this appeal: the priority, as between the interline claimants and the L&NE bondholder, with respect to the proceeds to be recovered in currently pending valuation proceedings. The district court by Order dated September 16, 1980, granted the railroad interline claimants, represented by appellees Committee of Interline Railroads ("Committee") and the Trustees of the Erie Lackawanna Railway Co.[2] ("Erie"), first priority in the valuation proceeds. Central Jersey Industries, Inc. ("CJI"), owner of all of L&NE's bonds, appeals from this order. We reverse.
 
 I.
 
 3
 L&NE was formed in 1961 as a wholly-owned subsidiary of the Central Railroad Co. of New Jersey ("CNJ"). Following a default by CNJ of certain loans guaranteed by the ICC, all L&NE stock, bonds and equipment were transferred to, and registered in the name of, the United States. When CNJ was reorganized in 1979 as CJI, the claims of the United States were satisfied and the reorganized corporation regained full ownership of the L&NE bonds. These bonds, in a principal amount of $2,500,000, are secured by an indenture, dated July 1, 1961, to which virtually all of L&NE's real property is subject.
 
 
 4
 On April 1, 1976, during the period when the United States owned all of L& NE's stock, bonds and equipment, some of L&NE's rail properties were transferred to Consolidated Rail Corp. ("Conrail"), pursuant to the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 et seq. L&NE presently has a claim outstanding against the United States for the value of those assets conveyed to Conrail. This claim is currently in litigation to determine the amount of the "valuation proceeds." The interline claimants seek to be paid their balances from these valuation proceeds.[3]
 
 
 5
 The L&NE went into receivership on September 26, 1977.[4] On February 9, 1979, the Committee of Interline Railroads, a group of railroads with interline claims against L&NE, petitioned the district court for a declaratory order stating that pre-receivership interline freight revenues collected by L&NE should be held in trust by L&NE, and that the interline railroads should be permitted to set off all pre-receivership accounts and debts owed to L&NE against the trust funds owed to them. In an Order dated June 6, 1979, the district court ordered that:
 
 
 6
 1. Pre-receivership freight revenues collected by Lehigh on behalf of the Interlines are held in trust by Lehigh on behalf of the Interlines.
 
 
 7
 2. The Interlines are entitled to recovery of such revenues, after first setting off all pre-receivership accounts or debts owed by the Interlines to Lehigh.
 
 
 8
 3. Lehigh shall not pay any resulting balances due to the Interlines until further order of this Court.
 
 
 9
 App. at 65.
 
 
 10
 On June 15, 1979, the Receiver notified the court that there were insufficient funds in the general account of the L&NE estate to pay all interline claims and all administration expenses. See App. at 66.
 
 
 11
 At that time, the assets of L&NE fell into three separate categories: a trust account containing $444,171.63, maintained at the Security National Bank (the general trust account); an account containing $118,644.71 which represents proceeds from the sale of property subject to the 1961 indenture (the mortgaged release account); and a claim against the United States for the value of the rail assets of the L&NE which were conveyed to Conrail in April, 1976 (the valuation proceeds). The net book value of these latter assets is $3,054,407.00. See App. at 77-78, 156.
 
 
 12
 In September, 1979, the Committee filed a motion for payment of the trust funds. While this motion was pending, the Receiver filed a petition for the approval of a plan of liquidation. This plan provided that the balance of the interline claims would be paid from the valuation case proceeds before such proceeds were made available to CJI as bondholder. See App. at 81. The Receiver interpreted the June 6, 1979 Order of the court to mean that all of the assets in his hands, "regardless of their origin, (were) impressed with a trust on behalf of the interline freight creditors." See App. at 80.
 
 
 13
 The Receiver subsequently modified his plan. Under the modified plan, interline freight claimants were to receive substantially all of the monies in the general trust account and to share pari passu with the bondholder in the valuation proceeds. In addition to its share of the valuation proceeds, the bondholder would receive immediate payment of the funds in the mortgaged release account,[5] less a sum for administration expenses incurred by the estate. Objections to this plan were filed by the Committee and the Erie trustees.
 
 
 14
 After a hearing, the district court issued an opinion and order in which it determined that $37,500 in the general trust account should be set aside for administrative expenses and the balance paid over to interline claimants on a pro rata basis. The court also accepted CJI's offer to make a substantial contribution from the mortgaged release account toward administration expenses, and determined that the balance of funds in that account should be disbursed to CJI as sole owner of the L&NE bonds. In its order, the court reserved judgment as to the priorities to be accorded to creditors with regard to the valuation proceeds.
 
 
 15
 On March 25, 1980, the Receiver distributed, in accordance with the District Court's decision, $433,789.13 to interline freight claimants from the general trust account. This represented a distribution to each interline claimant of approximately 55% of its claim. App. at 163.
 
 
 16
 By an Order dated September 16, 1980, the District Court awarded "a first priority" in the valuation proceeds to the interline creditors, "a second priority" to CJI, and "a third priority" to general creditors. This appeal followed.
 
 
 17
 As indicated above, the sole issue presented by this appeal concerns the district court's determination of priorities in the valuation proceeds. Before addressing this matter, however, we must decide a preliminary issue which surfaced during the oral argument: whether the instant action, an equity receivership in which jurisdiction is based on diversity of citizenship, is governed by federal or state law. It is to this inquiry that we now turn.
 
 II.
 
 18
 CJI contends that under the choice of law rule announced in Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the law of New Jersey, the forum state, governs this action. If we were to accept this position, we would then have to determine which state's substantive laws a New Jersey court would apply in an action such as this.[6] We need not reach this choice of law question, however, for we are satisfied that federal law should govern the instant matter.
 
 
 19
 Under Erie, supra, we are instructed that a federal court sitting in a diversity case must apply the substantive law of the forum in which it is sitting. In so holding, the court declared: "(t)here is no federal general common law." 304 U.S. at 78, 58 S.Ct. at 822. Nevertheless, the Supreme Court has observed that, notwithstanding the rule of Erie, supra, federal common law may govern, even in diversity cases, where a uniform national rule is necessary to protect or further the interests of the federal government. Texas Industries, Inc. v. Radcliff Materials, Inc., --- U.S. ----, ---- - ----, 101 S.Ct. 2061, 2066-69, 68 L.Ed.2d 500 (1981); City of Milwaukee v. Illinois, --- U.S. ----, ---- - ----, ---- - ----, 101 S.Ct. 1784, 1787-91, 1800-03, 68 L.Ed.2d 114 (1981); Miree v. DeKalb County, 433 U.S. 25, 28-29, 97 S.Ct. 2490, 2493-94, 53 L.Ed.2d 557 (1977); Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). The Supreme Court, therefore, "has applied federal common law where federally created substantive rights and obligations are at stake." Milwaukee, supra, --- U.S. at ----, 101 S.Ct. at 1803 (Blackmun, J., dissenting). See, e. g., Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 426, 84 S.Ct. 923, 939, 11 L.Ed.2d 804 (1964) (scope of the act of state doctrine determined according to federal law); Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456-57, 77 S.Ct. 912, 917-18, 1 L.Ed.2d 972 (1957) (federal substantive law applied in suits under § 301 of the Labor Management Relations Act); United States v. Standard Oil Co., 332 U.S. 301, 305, 67 S.Ct. 1604, 1606, 91 L.Ed. 2067 (1947) (federal law governs in action brought by United States to recover on a claim arising out of injuries sustained by a soldier as a result of negligence of defendant's truck owner and driver).
 
 
 20
 In Clearfield, supra, one of the seminal cases applying this specialized federal common law rule, the Court held that a suit by the United States to recover on an express guaranty of prior endorsements on a government check with a forged endorsement was governed by federal rather than state law. The court reasoned that "(w)hen the United States disburses its funds or pays its debts, it is exercising a constitutional function or power," and that the government's authority to issue such checks has its origin in the federal constitution and statutes. Thus, the government's authority is not dependent on the law of any state. 318 U.S. at 366, 63 S.Ct. at 574. In so holding, the Court emphasized the following federal interests:
 
 
 21
 The issuance of commercial paper by the United States is on a vast scale and transactions in that paper from issuance to payment will commonly occur in several states. The application of state law, even without the conflict of laws rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform rule is plain.
 
 
 22
 Id. at 367, 63 S.Ct. at 575. As noted above, the Clearfield rule may also apply where, as here, jurisdiction is based on diversity. See Miree, supra, 433 U.S. at 29 n. 3, 97 S.Ct. at 2493 n. 3; Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 176, 63 S.Ct. 172, 173, 87 L.Ed. 165 (1942) (the Erie doctrine "is inapplicable to those areas of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its source in those statutes, rather than by local law"). See also First Southern Federal Savings & Loan Association v. First Southern Savings and Loan Association, 614 F.2d 71, 73 (5th Cir. 1980). Several considerations persuade us that the instant matter, involving a question relating to interline revenues, fits within the "specialized federal common law" exception to the Erie doctrine.
 
 
 23
 In the first place, the funds in question arose out of railroad operations in interstate commerce, the regulation of which is under the exclusive control of Congress. U.S.Const., art. I, § 8, cl. 3. It has never been disputed that L& NE was insolvent and that the proceeds available after liquidation will be distributed to its creditors. This proceeding was commenced as an Equity Receivership, and all parties have consistently treated this proceeding as just another railroad reorganization/liquidation. See note 4 infra. Throughout the course of litigation and up to this date, federal law has been applied. Indeed, had the choice of law question not arisen during the oral argument, the parties would have conducted this appeal on the same basis as they had conducted all prior proceedings.
 
 
 24
 Second, Congressional concern with the establishment and maintenance of a viable national rail system has been expressed in legislation designed to encourage and facilitate interline rail transportation, notably the Interstate Commerce Act, 49 U.S.C. § 10101 et seq., and the Regional Rail Reorganization Act of 1973, as amended, 45 U.S.C. § 701 et seq. Both of these statutes were designed to effectuate the national transportation policy of ensuring "the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States." 49 U.S.C. § 10101. Were it otherwise, local state or other boundaries might result in the interruption or termination in service of individual rail lines, thus thwarting the Congressional objective of a transportation system national in scope. Indeed, in In re Penn Central Transportation Co., 486 F.2d 519, 527 (3d Cir. 1973), cert. denied, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974) (the Trust Fund Case), our court recognized this long-standing Congressional policy of "encouraging interline rail transportation of freight and passengers nationwide."
 
 
 25
 Third, by establishing the Interstate Commerce Commission, Congress sought to regulate interstate commerce by rail, as well as by other means. In so doing, Congress required regulation of rates and the division of rates among the various railroads. These regulations necessarily affected the interline shipment of freight. The extent of the national interest affected by such rate regulation has been recognized by the Supreme Court in a number of cases where states themselves sought to prescribe rates in a manner that conflicted with national regulations. See, e. g., Wisconsin Railroad Commission v. Chicago, Burlington & Quincy Railroad Co., 257 U.S. 563, 42 S.Ct. 232, 66 L.Ed. 371 (1922); Houston, East & West Texas Railway Co. v. United States (the Shreveport Case), 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed.2d 1341 (1913). Thus, in Burlington, supra, Chief Justice Taft stated:
 
 
 26
 Commerce is a unit and does not regard state lines, and while, under the Constitution, interstate and intrastate commerce are ordinarily subject to regulation by different sovereignties, yet when they are so mingled together that the supreme authority, the Nation, cannot exercise complete effective control over interstate commerce without incidental regulation of intrastate commerce, such incidental regulation is not an invasion of state authority or a violation of the proviso.
 
 
 27
 257 U.S. at 588, 42 S.Ct. at 237.
 
 
 28
 Finally, it is manifest that uniformity is required in the manner and means by which interline freight accounts are balanced. As this court observed in the Trust Fund Case, supra, 486 F.2d at 521, "the nation's railroads function in many ways as a single system." See note 1 supra. To make this system dependent upon the application upon the various laws of the various states would not only place it in serious jeopardy, but also would virtually assure its destruction. See Clearfield, supra, 318 U.S. at 367, 63 S.Ct. at 575.
 
 
 29
 For these reasons, we are satisfied that the issues involved in this action implicate wholly national concerns and therefore should be governed by federal law. Our position in this respect is bolstered by the fact that had we been persuaded to apply state law, we would have been left with very little guidance from the substantive laws of the three states to which we might have looked: Delaware, Pennsylvania or New Jersey. See note 6, supra. Although our conclusion that federal law governs this matter obviates the need to determine which state law applies, we observe that even CJI admits that there are no New Jersey cases which are at all analogous to the railroad interline problem. See Supplemental Brief for CJI at 1-2. The same is true of Delaware and Pennsylvania law. Thus, regardless of whether we applied the law of any of these three states in this unique context, our disposition would be the same as the one we reach under federal law. We therefore hold that federal law applies to this proceeding.
 
 III.
 
 30
 Having concluded that federal law should govern our determinations in this case, we now turn our attention to the merits of this litigation. Despite contrary claims by the Committee and Erie, this court has not heretofore considered whether, once a railroad in receivership has expended all of its general funds, unpaid interline claims can or should be paid out of mortgaged assets prior to the satisfaction of the mortgage bondholder.
 
 A.
 
 31
 The district court, in concluding that the valuation proceeds should be held in trust for the benefit of the interline creditors, who would then have first priority on these proceeds, relied on our decision in the Trust Fund Case supra, and its progeny. CJI, however, argues that the Trust Fund Case is not dispositive of the present litigation. CJI distinguishes Trust Fund by arguing that in Trust Fund, there were always sufficient general monies, as distinct from mortgaged assets, to satisfy interline claimants. Thus, CJI contends that in Trust Fund, we did not have to consider whether interline claimants would still be entitled to payment priority where, as here, all the unmortgaged assets are insufficient to satisfy their claims. We agree.
 
 
 32
 In the Trust Fund Case, we made the following observations with regard to the interline accounting system:
 
 
 33
 (It is) a system by which one railroad collects monies owed by shippers to both itself and other railroads. The monies collected belong only in part to the collecting railroad; as to monies owed other railroads, the collecting railroad serves merely as a receiving and transmitting agent. A common sense interpretation of this system would indicate that funds collected by one railroad for and in behalf of another railroad are held in trust by the collecting railroad until the monies are transmitted.
 
 
 34
 486 F.2d at 523-24. The Trust Fund Case held that funds received from freight and passenger revenues by a collecting railroad were to be held in trust, and that the collecting railroad, even in reorganization, could set off against the trust funds it had accumulated, any claim it had against the demanding interline carrier.[7] In so holding, we rejected the reorganization trustees' argument that the interlines, by permitting Penn Central to commingle monies due them with Penn Central's general revenues, established a debtor-creditor relationship and not a trust:
 
 
 35
 Commingling of monies has minimal significance in the extraordinary operations of interline railroads. That Penn Central is not, as a destination carrier, required by the other carriers to immediately segregate funds collected does not necessarily reflect any intention to establish a debtor-creditor relationship in the face of the unique and complex interline railroad system. Normal operation conditions with innumerable daily collections of various categories preclude practically and economically any effective daily segregation.... This is not a simple situation of one party receiving money clearly designated as payment for services performed by another. When a carrier collects funds for another railroad, it does not immediately know what portion of the revenues collected is to be allocated to other carriers.
 
 
 36
 Id. at 525. Nevertheless, in concluding that Penn Central was obligated to pay any remaining balances due in its trust fund accounts to the interlines, we neither limited the assets from which the trust funds were to be paid, nor approved payment of such funds from mortgaged assets. Thus, the Trust Fund Case, rather than disposing of the issue which confronts us now, left the question open.
 
 
 37
 The Committee also argues that granting a priority to the payment of interline trust funds furthers the national rail transportation policy. In his concurring opinion in the Trust Fund Case, Judge Adams expounded upon the need for efficient functioning of the national transportation network:
 
 
 38
 Section 1(4) of the Interstate Commerce Act makes it the duty of each regulated rail carrier to participate in the interstate transportation of freight and passengers. In addition, it requires that the carriers "establish reasonable through routes with other such carriers, and just and reasonable rates, fares (and) charges ... applicable thereto." Carriers participating in through routes are directed to "provide reasonable facilities for operating such routes and ... to make reasonable rules and regulations with respect to their operation...." If connecting carriers fail to create voluntary through routes, section 15(3) of the Act empowers the Interstate Commerce Commission, under certain conditions, to order their establishment.
 
 
 39
 The policy underlying this statutory arrangement is not difficult to discern. "Interline," long-distance rail carriage over a through route obviates much of the need for duplicative, parallel rail lines. Additionally, through-route service precludes the inconvenience that would result if a shipper had to make separate arrangements with each interconnecting carrier for a long-distance haul. A vigorous and efficient interline rail network thus assures that, as the court below stated, "(t)he nation's railroads function in many ways as a single system." The sections of the Interstate Commerce Act discussed above seek to foster and preserve this unitary rail scheme.
 
 
 40
 (footnotes omitted). Id. at 531-32. (Adams, J., concurring). Although no particular method of collection is mandated by statute, and thus interline carriers could insist upon immediate payment by the shipper, we recognize that the present method of collection, which has been described above, is the only feasible one, and that insistence by each interline carrier upon immediate payment might well undermine the entire system and "greatly impede the smooth and efficient functioning of the through-route network." Id. at 532 (Adams, J., concurring).
 
 
 41
 We therefore do not discount the Committee's argument that it is in the interest of national transportation to accord the interlines a first priority in the valuation proceeds so as to prevent the possibility of the interlines demanding immediate payment a demand which might thereby dislocate the through-route system. Nevertheless, we are persuaded that different considerations militate in favor of the bondholder in the instant case. As indicated above, the Trust Fund Case did not discuss what priority, if any, interline claimants should receive ahead of other creditors once railroad operations have ceased and there has been complete dissipation of all funds with which the trust funds were commingled. Nor was this issue presented in any decision following the Trust Fund Case. See, e. g., In re Penn Central Transportation Co., 553 F.2d 12 (3d Cir. 1977) (reaffirming our adherence to the Trust Fund doctrine by holding that we would not disturb the orders of the reorganization court allowing the debtor's agent in reorganization to defer payment of pre-conveyance per diem obligations owed by the debtors to other interline railroads). Thus, we are satisfied that our decision here is not controlled by the Trust Fund Case.
 
 B.
 
 42
 CJI, the bondholder, argues that where a trustee has commingled trust funds in an account containing other funds, and the mingled fund is at any time wholly depleted,[8] the trust fund is thereby dissipated and cannot again resume the character of trust funds even when the account is replenished. See Sonnenschein v. Reliance Insurance Co., 353 F.2d 935, 938 (2d Cir. 1965) ("where mingled funds are withdrawn, 'the equity of the cestui is lost although moneys from other sources are subsequently deposited in the same account' "). To illustrate its argument, CJI explains:
 
 
 43
 The matter is analogous to a glass of water, 95% of the contents of which is poured out. If this glass is refilled and 95% again poured out and the whole process repeated many times, very little of the original water will remain. However, no one can say that none of it is still there. But, if the glass is completely emptied, one can state with assurance that none of the original water is there any more. In the case at bar, the glass has been completely emptied and the interline claimants are seeking priority on the water in the pitcher. This is something they have no right to. CJI has a mortgage on that water.
 
 
 44
 Reply Brief for CJI at 5.
 
 
 45
 The "dissipation of trust" rule upon which CJI relies was explained in In re J. M. Acheson Co., 170 F. 427 (9th Cir. 1909), a case in which a bankrupt sold property consigned to him under a contract which required him to hold the proceeds of sale in trust until paid to the owner. The bankrupt subsequently mingled those trust funds with his own and used them in his business. In holding that the owner was entitled to recover such trust funds in full, but only insofar as he could show that such funds or the property into which they were converted came into the hands of the bankrupt's trustee and have increased the estate, the court stated:
 
 
 46
 We do not mean to be understood as holding that equity will grant to a cestui que trust relief against any assets in the hands of a trustee, for it will not go farther than to give a lien when the facts are that there remain in the estate specific funds or property which have increased the assets of the estate, and which represent the proceeds of the specific property intrusted to the bankrupt. Lowe v. Jones, Adm'r, 192 Mass. 94, 78 N.E. 402, 6 L.R.A. (N.S.) 487, 116 Am.St.Rep. 225. Moreover, if there has been expenditure, and the funds are gone, and no specific property or money is found instead of the funds, it is inequitable that some other property found should be applied to pay one creditor in preference to another. So, funds that have been dissipated or that have been used to pay other creditors or that have been spent to pay current business expenses are not recoverable, because they are gone and there is nothing remaining to be the subject of the trust.
 
 
 47
 Id. at 430 (emphasis supplied).
 
 
 48
 In Sonnenschein, supra, an insurance agent of the claimant insurance companies had entered into a contract with a factoring company, pursuant to which the agent transferred insurance premiums due to the insurance companies, to the factoring company, as security for loans and advances. The factoring company deposited these funds to its general account. When the factoring company instituted Chapter XI Bankruptcy proceedings, the insurance companies sought to reclaim some $22,000 which represented the insurance premiums which they were due. At the time of the Chapter XI proceedings, the factoring company reported, as assets, about $538 in cash and $64,000 in accounts receivable. The Referee in Bankruptcy held that the insurance companies were entitled to immediate payment of their claimed $22,000, since the debtor had failed to show that these funds were not trust funds. The district court upheld the Referee's order, stating: "... once it is established that the debtors hold funds in trust for the insurance companies, nothing more is necessary ... to impress an equitable lien upon the assets of the debtor equal to the amount of said funds." Id. at 936. The Court of Appeals reversed, holding that the funds had been paid to the debtor prior to the bankruptcy proceedings; they had been placed in a general account, thus they were mingled; the funds were thereafter dissipated, "... e. g., the debtor's cash supply of $538.89 obviously could not satisfy the (claim) ... (and) the $22,159.93 of trust funds could not be identified per se with (the) 'accounts receivable' ". Id. at 937. In so holding, the court recited what it characterized as the "well-established" rule that:
 
 
 49
 (T)o sustain a claim to trust property or to an equitable lien thereon, the claimant must depend upon his ability to identify the property in its original or substituted form in the hands of the (debtor).... The basic idea of the trust doctrine as applied in bankruptcy is a fair and reasonable identification of the property or fund so as not to harm other creditors. It is not enough, therefore, to show merely that the funds or property came into the bankrupt's hands ... the claimant must assume the burden of ascertaining and tracing the trust property, and where it is alleged that such property has been converted into other property in the hands of the bankrupt, the claimant has the burden of tracing the trust property thereon.
 
 
 50
 Id. 936-37.
 
 
 51
 Thus, CJI argues that the principles which protect general creditors against trust fund claimants when the trust funds have been dissipated, "ought to apply a fortiori to protect secured creditors against such claims." Brief for CJI at 10. It is difficult to refute the logic of that argument.
 
 
 52
 Here, the interline claimants assert that they have a priority to the proceeds which will be received from mortgaged property. They have never established, however, a claim to that property in the first place. On the contrary, CJI, as bondholder, is justified in its expectation that its bonds will be satisfied from the mortgaged property which secures its indenture.
 
 C.
 
 53
 Moreover, our decision to accord the bondholder the security in the valuation proceeds to which it is entitled comports with the protection which our court has consistently assured security interests in other contexts. See, e. g., Citibank, N. A. v. Fullam, 580 F.2d 82 (3d Cir. 1978) (writ of mandamus issued to compel district court to insure that bondholders would not be prejudiced by continued use of rental income from mortgaged property to finance administration expenses); In re Penn Central Transportation Co. (Columbus Option Case), 494 F.2d 270 (3d Cir.), cert. denied, 419 U.S. 883, 95 S.Ct. 147, 42 L.Ed.2d 122 (1974); (proceeds of sale of unmortgaged capital assets of debtor were not to be expended for general operations unless reorganization court found that remaining unsecured assets were adequate to protect indenture trustees from injury and were adequate to satisfy the trustees' certificates); Central Railroad Co. v. Manufacturers Hanover Trust Co., 421 F.2d 604 (3d Cir.), cert. denied, 398 U.S. 949, 90 S.Ct. 1867, 26 L.Ed.2d 289 (1970) (improper to allow Reorganization Trustee to draw money from bondholders' account to pay for removal of damaged portion of drawbridge without imposing some obligation upon trustee to repay such funds).
 
 
 54
 The Committee, however, does not read Citibank and Columbus Option as we do. Rather, the Committee argues that these cases support its position that "property securing a mortgage may and often does become subject to superior, later-arising liens that are entitled to be satisfied not only ahead of the secured creditor but also out of the very property that secured that creditor's claim." Supplemental Brief for the Committee at 7. The Committee's reliance on these cases to establish that proposition is misplaced, however, as it fails to acknowledge the qualifications and safeguards which our court has consistently imposed and required, in order that improper invasion of a bondholder's security does not occur.
 
 
 55
 Citibank, supra, was an action in which the petitioner sought a writ of mandamus to compel the district court to comply with an earlier order of this court. That order had directed that rent from secured property not be used to finance the expenses of reorganizing the debtor's estate, unless the district court made findings: first, that the funds necessary to meet the operating deficits were not available elsewhere, and second, that the bondholders' interests would be benefitted, or at least not prejudiced, by the use of rental income arising from the mortgaged property. In granting the writ, this court observed that the district court had failed to make the requisite findings with respect to the bondholders' "benefit" or "lack of prejudice." The emphasis which our court placed upon bondholder protection is apparent from its concluding instructions:
 
 
 56
 Nor do we think that the need to pay government tax claims justifies denying the relief sought here. If on remand Judge Fullam finds that the bondholders will not be prejudiced by the trustee's use of the Claremont Terminal rents, the trustee can use those monies. If, on the other hand, Judge Fullam finds that the bondholders might be prejudiced by such use, he should direct that the rental monies be placed in an escrow account for the benefit of the bondholders. But if at the end of the reorganization proceedings Judge Fullam concludes that the secured property should bear some of the burden of the government tax claims, he can, at that time, order that a reasonably proportionate share be paid from the escrow account.
 
 
 57
 Id. at 90.
 
 
 58
 Columbus Option, supra, does not differ from Citibank in the concern which it expresses for secured creditors. In Columbus Option, the reorganization court had authorized the sale of certain unmortgaged properties of the debtor. Secured creditors appealed, claiming that such sales would have the effect of diluting their security because the unmortgaged property was subject to the overriding lien of the United States, which secured certain Trustee certificates.[9] This court held that the unmortgaged assets could not be sold without providing protection for the secured parties. It therefore reversed the reorganization court's orders, "to the extent that they permit(ted) the expenditure of proceeds of sale of unmortgaged capital assets of the debtor for general operations of the debtor or for reimbursement of operating funds for past or future additions or betterments to unmortgaged assets." 494 F.2d at 284. The holding of Columbus Option thus is a far cry from any contention that may be asserted, that on liquidation, a bondholder's security may be invaded for satisfaction of unsecured pre-bankruptcy claimants.
 
 
 59
 Indeed, as the foregoing discussion of Citibank and Columbus Option indicates, those cases are distinguishable from the issue before us, not only because they involve the claims of general creditors, as opposed to trust fund beneficiaries, but also because their analyses focus on whether assets of an operating railroad in reorganization can be used to fund current operations. As we have observed, L&NE ceased operations in 1975, and is now in the process of liquidation. The funding of current operations therefore is not an issue here. On the authority of those cases, therefore, we are not persuaded that CJI, the bondholder here, has relinquished any rights to the interline claimants, in the property that secures CJI's indenture.
 
 D.
 
 60
 The last contention made by the Committee is that the "necessity of payment" principle supports its position that interline creditors may be paid out of the corpus of mortgaged property. Union Trust Co. v. Illinois Midland Railway Co., 117 U.S. 434, 29 L.Ed. 963 (1886), Miltenberger v. Logansport Railway Co., 106 U.S. 286, 1 S.Ct. 140, 27 L.Ed. 117 (1882).
 
 
 61
 Judge Hastie, writing for this court in In re Penn Central Transportation Co., 467 F.2d 100 (3d Cir. 1972), explained the "necessity of payment" doctrine as "... permit(ting) immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid." 467 F.2d at 102 n.1. Subsequently, the reorganization court approved the Plan of Reorganization for the Penn Central Transportation Co. and again addressed the "necessity of payment" rule. In the Matter of Penn Central Transportation Co., 458 F.Supp. 1234 (E.D.Pa.1978), aff'd. as modified on other grounds, 596 F.2d 1102 (3d Cir. 1979). In rejecting the priority claims asserted by a number of creditors, including the interline railroads, the reorganization court stated:
 
 
 62
 All else aside, the necessity of payment doctrine, by its very nature, depends for its applicability upon the economic realities of the market place, and the dominant or subservient positions of the parties. It is simply unrealistic to suggest, for example, that an electric utility such as Con Ed would even consider cutting off a customer paying it well over $1 million per month (and paying it promptly, under a Court order) merely because a single month's pre-bankruptcy bills remained unpaid. And it is obvious that the interline railroads, to whom Penn Central service was essential, were never in a position to sever relationships, and thus could never qualify under the necessity of payment rule.[84]
 
 
 63
 84. Some diversion of traffic to other, non-bankrupt, lines may have been possible, and some no doubt occurred, but the direction to pay post-bankruptcy interlines currently served to obviate this difficulty for the most part. Moreover, since all of the major Northeastern railroads were in bankruptcy, the interline railroads were not in a strong bargaining position.
 
 
 64
 Id. at 1328.
 
 
 65
 Thus, the "necessity of payment" doctrine, as it has developed since its original enunciation in Miltenberger, supra, teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the railroad during reorganization, payment may be authorized even if it is made out of corpus. See In re New York, New Haven & Hartford Railroad Co., 278 F.Supp. 592, 602 n. 15 (D.Conn.1967), aff'd, 405 F.2d 50 (2d Cir. 1968), cert. denied, 394 U.S. 999, 89 S.Ct. 1592, 22 L.Ed.2d 776 (1969). Significantly, however, the sine qua non for the application of the "necessity of payment" doctrine is the possibility that the creditor will employ an immediate economic sanction, failing such payment. In such a circumstance, it is evident that the payment made under the "necessity of payment" rule is in the interest of all parties, including the mortgagees, because such payment will facilitate the continued operation of the railroad. Indeed, the interruption or termination of the railroad's service can have an equally detrimental effect upon the secured creditors as upon the general creditors. See New Haven & Hartford, supra, 278 F.Supp. at 602 n. 15.
 
 
 66
 As the foregoing discussion demonstrates, in order to justify payment under the "necessity of payment" rule, a real and immediate threat must exist that failure to pay will place the continued operation of the railroad in serious jeopardy. The "necessity of payment" rule therefore can have no application in the context of these interline claimants, since the L&NE railroad is no longer in operation, see In re Penn Central Transportation Co., supra, 458 F.Supp. at 1326, and indeed with respect to these interline claimants, has not operated since 1975. See note 3 supra.
 
 E.
 
 67
 Our holding here is neither an expansive nor a broad one. We do no more than recognize that the general principles which we have found applicable in the Trust Fund cases, cannot control a situation where all funds have been dissipated. In such a circumstance, as we have discussed, the principles of established and traditional trust law require that the trust fund claimants, who are unable to identify the funds set aside for them, may not invade a secured bondholder's interest, even when the trust fund claimant has been endowed with his status by the special considerations which this court has recognized in the case of interline claimants.
 
 
 68
 CJI, as bondholder, therefore, under the particular circumstances presented in this case, must be accorded first priority in the proceeds recovered in the valuation proceedings.[10]
 
 IV.
 
 69
 For the reasons we have given, we hold that the district court erred in ordering that the balance of unpaid interline claims be paid out of the valuation proceeds prior to the satisfaction of the secured claims of CJI, the bondholder. Accordingly, we will reverse the district court's order of September 16th, 1980, which granted the interline creditors a first priority in the valuation proceeds and CJI a second priority in said proceeds, and remand to the district court with directions to enter an order consistent with this opinion.
 
 
 
 [1]
 An "interline railroad" is a railroad common carrier which cooperates with other railroads in the transportation of passengers or property over their lines, as required of all railroads engaging in interstate commerce by the Interstate Commerce Act. See In re Penn Central Transportation Co., 486 F.2d 519, 520 n. 1 (3d Cir. 1973), cert. denied, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974) (the "Trust Fund Case"). A succinct description of the system of accounts of interline railroads is found in the Trust Fund Case, 486 F.2d at 521:
 The nation's railroads function in many ways as a single system. For example, a shipper or receiver pays one railroad for services of carriage for the entire shipment, although the shipment may travel over many different railroads; a railroad car may travel over the lines of many different railroads, and be used by each of them, before it again returns to the possession of the owning railroad; and a shipper whose freight may have been damaged in shipment by one of several carriers may apply to any of them for payment of his claim. The railroads have created a system of accounting and periodic settlement of accounts to facilitate this manner of operation. The accounting for various types of rail service rendered to the public or to other railroads results in "interline accounts," and the striking of balances between the railroads with respect to these interline accounts results in "interline balances." Each of the accounts is settled separately; there is no netting of the balances in different accounts.[1]
 
 
 [1]
 This system of accounts is established and governed by rules promulgated by the Association of American Railroads ("AAR")
 (quoting opinion of District Court, 340 F.Supp. 857-59 (E.D.Pa.1972)).
 
 
 [2]
 The Receiver of L&NE and Consolidated Rail Corp. (an interline freight creditor) join in the legal arguments advanced by the Committee
 
 
 [3]
 L&NE ceased operations on January 24, 1975 due to its declining financial condition. The ICC entered service orders pursuant to 49 U.S.C. § 1(16)(b) directing two rail lines, Lehigh Valley Railroad and the Reading Railroad, to provide service over L&NE's lines. Lehigh & New England Railway Co. v. ICC, 540 F.2d 71, 76 (3d Cir. 1976). Their service was provided until the conveyance to Conrail in April, 1976. As a consequence, the interline balances claimed now are for services rendered by the interline claimants prior to January 25, 1975
 
 
 [4]
 The complaint filed in federal district court by the trustee of the CNJ against L&NE sought, among other things, the appointment of a receiver, alleging that L&NE was insolvent. The complaint was brought on the basis of diversity jurisdiction and the receiver that was appointed was an Equity Receiver. The Committee's Supplemental Brief at 3 explains:
 (T)his Debtor was a railroad company which did not want to reorganize, (and thus) neither "straight" bankruptcy nor a § 77 reorganization was available to it under the Bankruptcy Act in effect when this case was commenced (see former Bankruptcy Act § 4, former 11 U.S.C. § 22; and former Bankruptcy Act § 77(a) (first sentence), former 11 U.S.C. § 205(a)). Therefore, appellant (the Debtor's parent corporation) employed the device of an equity receivership simply as an interstitial remedy.
 
 
 [5]
 Under the Receiver's original plan, the funds in the mortgaged release account were to be used to pay pre-receivership interline obligations rather than the bondholder. See App. at 80
 
 
 [6]
 The choice of law determination would be made from among three states: Delaware (the Debtor's state of incorporation and arguably the location of the Valuation Case claim), Pennsylvania (according to the Verified Complaint, the Debtor's principal place of business and arguably the location of the Valuation Case claim), or New Jersey (the domicile of the Receiver who has jurisdiction over all assets of the Debtor "wheresoever located"). See Supplemental Brief for the Committee at 2
 
 
 [7]
 In the Trust Fund Case, supra, we also held that certain other interline accounts, including per diem (daily car rental) accounts, car repair accounts, etc., were not held in trust and that, with respect to those accounts, "the interlines ... are in exactly the same position as other suppliers of Penn Central who were unpaid for goods and services delivered prior to the filing of the reorganization petition." 486 F.2d at 519
 
 
 [8]
 The general fund included interline payments and thus would have constituted a trust fund under the Trust Fund Case. The trust fund is now depleted as a result of two occurrences: (1) the railroad used the funds to pay normal operating expenses; and (2) the January 28, 1980 court order required the Receiver to pay out the balance to the interline claimants on a pro rata basis. But see Erie's contentions reflected in note 10, infra
 
 
 [9]
 For an example of the relationship between the government lien, the secured creditors, and the sale of unmortgaged assets, see note 1 of Judge Rosenn's concurring opinion in In re Penn Central Transportation Co. (Columbus Option Case), 494 F.2d 270, 284 (3d Cir.), cert. denied, 419 U.S. 883, 95 S.Ct. 147, 42 L.Ed.2d 122 (1974)
 
 
 [10]
 In light of our disposition, we have no need to address CJI's second argument, that the district court had failed to limit the priority which it gave to interline claims to just freight revenue received by L&NE
 Nor need we resolve a "late blooming" argument made by Erie. In Erie's Supplemental Brief, Erie argues, that even if our ruling reverses the district court's order, as it does, we nevertheless should remand for a hearing as to the propriety of the funds expended which resulted in the ultimate depletion of the general trust account. We observe that Erie's offer of proof in this respect apparently surfaced for the first time in the December 27, 1979 hearing, some three months after Order # 965, "Order In Aid of Consummation of Amended Plan of Reorganization of the Central Railroad Company of New Jersey" was entered. CJI argues in this connection, that any such claim should have been asserted in the CNJ reorganization.
 Of more significance to us, however, is the stage at which this issue has been raised on appeal. The issue on which the parties focused here, was a purely legal issue: the right of interline claimants to the valuation proceeds. We have held in this opinion that their rights are subordinate to CJI, the secured bondholder. If questions collateral to this determination, such as the argument now raised in Erie's Supplemental Brief, are to be resolved, they should be addressed in the first instance to the district court. Nothing we have held in this opinion would preclude Erie from making any such application to that court.