OPINION OF THE COURT
COWEN, Circuit Judge.
Columbia Gas Transmission Corporation (“Columbia”), an owner of a natural gas pipeline, filed a bankruptcy petition and moved for court permission to pay certain pre-peti- *1051 tíon obligations, including: (1) refunds collected from upstream suppliers and owed to Columbia’s customers; (2) research surcharges collected from customers and owed to a nonprofit industry research institute; and (3) bills for purchases of natural gas from upstream suppliers. The district court held that all of these funds are property of the bankruptcy estate, and therefore may not be distributed to select creditors. Columbia asserts that since it holds these funds in trust, the money it seeks to distribute to satisfy these obligations is not property of its bankruptcy estate.
Federal common law, rather than state law, governs the inquiry whether Columbia holds these monies in trust. Applying federal common law, we conclude that Columbia holds the customer refunds and research surcharges in trust, but the obligations to upstream suppliers are ordinary unsecured debt. Accordingly, we will reverse in part and affirm in part the order of the district court, and remand for further proceedings consistent with this opinion.
I. FACTUAL AND PROCEDURAL BACKGROUND
Columbia purchases natural gas from upstream pipeline suppliers, transports this gas in interstate commerce, and resells it to local distribution companies. The local distribution companies, about half of which are affiliates of Columbia, then sell this natural gas to the ultimate users, the gas-consuming public. Columbia transports natural gas through 18,-900 miles of pipeline to thirteen Northeastern, Middle Atlantic, Midwestern and Southern states, as well as to the District of Columbia. Together with its affiliates, Columbia operates one of the largest natural gas systems in the country. As such, its operations are extensively regulated by the Federal Energy Regulatory Commission (“FERC” or “Commission”) pursuant to the Natural Gas Act (“NGA”), 15 U.S.C. §§ 717-717w (1988 & Supp. Ill 1991). Among other things, FERC ensures that the rates gas companies charge are just and reasonable. See id. § 717c(a).
On July 31, 1991, Columbia and its parent corporation, The Columbia Gas System, Inc., filed petitions for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101-1174 (1988 & Supp. Ill 1991), in the United States Bankruptcy Court for the District of Delaware. Columbia continued to operate as a debtor in possession. See 11 U.S.C. §§ 1107, 1108. On August 23, 1991, Columbia filed a motion (the “FERC motion”) requesting authority to pay certain pre-petition obligations in order to comply with its FERC tariff orders. Specifically, Columbia sought: (1) to refund to its customers amounts refunded to it by upstream pipelines that previously had overcharged it for gas and transportation services; (2) to pay surcharges collected from customers and owed to the Gas Research Institute (“GRI”); and (3) to pay bills for pre-petition purchases of natural gas supplies and transportation services from upstream pipelines.
A. Overview of the Federal Regulatory Scheme
Interstate natural gas pipelines are subject to extensive federal regulation under the Natural Gas Act, and FERC regulations and orders. Natural gas companies initially set their own rates and other terms for the transportation or sale of gas, typically by contract with their customers. See United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 341, 76 S.Ct. 373, 379, 100 L.Ed. 373 (1956). All rates, however, must be “just and reasonable” or they are unlawful. 15 U.S.C. § 7170(a).[1]
' FERC, not the courts, initially decides whether rates are reasonable. See Montana-Dakota Util. Co. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951). Therefore, natural gas companies must file with FERC all proposed rates and contracts for the sale or transportation of gas, see 15 U.S.C. § 717c(c), and may not change a filed rate or contract with *1052 out providing FERC with thirty days notice, see id. § 717c(d). The Commission may modify or reject any proposed rate or contractual term that fails to comply with the Natural Gas Act. See id. § 717d(a).
When a pipeline files a proposed rate change, FERC must issue an order within thirty days approving or invalidating the new rate. The Commission also has authority to preserve the status quo pending its review of a newly filed rate by suspending the effectiveness of the proposed rate for up to five months. See id. § 717c(e). If FERC suspends a rate that takes effect after five months, the new rate becomes effective subject to refund if FERC later declares the rate unreasonable. See id. § 717c(e). Refunds are retroactive to the date the new rate took effect and include interest from the date of collection at a rate based on the prime rate. See 18 C.F.R. § 154.67(c)(2)(iii) (1992).
FERC’s power is not limited to reviewing changes in rates and contractual terms; it also may review existing rates and practices of natural gas companies. If the Commission finds that any rate, contract or practice of a gas company is unjust, unreasonable, unduly discriminatory or preferential, it may determine the reasonable rate, contract term or practice and order the offending company to comply with its determination. See 15 U.S.C. § 717d(a). The Commission may not, however, impose a rate retroactively if it finds that a previously approved rate is unjust or unreasonable. See Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 578, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981); see also 15 U.S.C. § 717d(a). Instead, FERC may adjust for past unreasonably high or low charges when it sets future rates.
The provisions of the NGA outlined above give rise to the “filed rate doctrine.” Under that doctrine, a reasonable rate is that which FERC fixes, subject only to deferential judicial review. See Mississippi Power & Light Co. v. Moore, 487 U.S. 354, 371, 108 S.Ct. 2428, 2439, 101 L.Ed.2d 322 (1988). Once the reasonable rate is determined, gas companies may not collect any other rate. See Arkansas Louisiana Gas Co., 453 U.S. at 578, 101 S.Ct. at 2931.
B. Background of Columbia’s Claims
Because of the shortage of natural gas in the late 1970s and early 1980s, many pipeline owners, including Columbia, entered into long-term contracts with natural gas producers containing take-or-pay clauses. A take- or-pay clause obligates a pipeline to purchase a certain amount of gas at a specified price. The pipeline agrees to pay for a set quantity of gas even if it actually takes less. By 1987, an oversupply of natural gas significantly decreased market prices, and pipeline customers had little incentive to purchase gas from pipelines at prices sufficient to allow the pipelines to cover the cost of gas they agreed to pay in their take-or-pay contracts. As a result, pipelines’ gas sales declined, and the pipelines faced billions of dollars in accrued and future take-or-pay liability.
In response to this crisis, FERC allowed pipelines to buydown or buyout their contracts with producers. In a buydown, a pipeline pays to reform the contract. In a buyout, a pipeline pays a supplier to terminate the contract. To alleviate the pipelines’ financial hardship, FERC issued Order 500, an interim rule, which required producers, pipelines and pipeline customers to equitably share the costs associated with buydowns and buyouts. See Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 52 Fed.Reg. 30,334 (1987) (“Order 500”). In short, Order 500 provided that if a pipeline agreed to absorb twenty-five to fifty percent of its settlement costs to buydown or buyout its high-cost contracts, the pipeline could pass through an equal portion to its customers through fixed charges. Order 500 permitted pipelines to utilize the purchase deficiency method to allocate these fixed charges among its customers. The purchase deficiency method assigned a customer a share of the buyout or buydown costs in proportion to the decline in that customer’s gas purchase. Pursuant to Order No. 500, Columbia filed a tariff with FERC to recover its buyout costs from its customers.
The Court of Appeals for the District of Columbia Circuit struck down the purchase deficiency allocation method because it violated the filed rate doctrine of the NGA by *1053 imposing a retroactive rate increase for gas sold in the past. See Associated Gas Distribs. v. FERC, 893 F.2d 349, 355 (D.C.Cir.1989), cert. denied, 498 U.S. 907, 111 S.Ct. 277, 112 L.Ed.2d 232 (1990). After this decision, FERC issued Order No. 528, which required pipelines to file new tariffs that allocated the fixed charges pursuant to a different formula. See Mechanisms for Passthrough of Pipeline Take-or-Pay Buyout and Buydown Costs — Order No. 528, 53 FERC (CCH) ¶ 61,163, at 61,594-95, 1990 WL 488926 (1990) (“Order 528”). Order 528 also required the suppliers to refund the amounts customers had been overcharged under the purchase deficiency formula. Id. at 61,595-96.
Pursuant to Order 528, five upstream pipelines that supplied gas to Columbia filed new rate schedules which allocated $134 million less in buyout or buydown costs to Columbia than under the purchase deficiency method. Columbia, in turn, filed tariff provisions with FERC to flow through these refunds to its downstream customers. These refunds, together with approximately $26 million in refunds arising from other overcharges for gas and transportation services, comprise the customer refunds that Columbia seeks to exclude from its bankruptcy estate and pay to its customers. At the time it filed for bankruptcy, Columbia already had received only $21 million in refunds from the upstream pipelines and expected to receive $140 million in the future.
Columbia maintained its financial records in accordance with the Uniform System of Accounts promulgated by FERC. See 18 C.F.R. Pt. 201 (1992). When Columbia received a refund, it recorded an increase to its assets and a corresponding liability to the appropriate customers. It did not pay income tax on refunds unless it failed to forward the money to its customers within eight and a half months. Columbia tracked the various refunds through separate paper accounts. These accounts are not actual money accounts, but informational mechanisms for accomplishing the complicated task of tracking its refund obligations. Accounts were created based on the source of the refund, the legal reason for the refund, the time period to which the refund relates, and the designated downstream recipient. This process required Columbia to maintain approximately one hundred separate refund accounts.
Columbia received refunds from upstream suppliers in the form of checks, wire transfers and billing credits, and passed refunds through to its customers through all of these devices. Columbia paid interest to its customers at a statutorily prescribed rate for the time it retained the customer refunds. See 15 U.S.C. § 717c(e); 18 C.F.R. § 154.-67(c)(2).
Although it meticulously tracked refunds on paper, Columbia did not maintain separate bank accounts for the different refunds. It employed a combined cash management system and utilized all of its cash without restriction. At the end of every day, excess cash was either invested or used to repay short-term debt to its parent. Therefore, when it filed its bankruptcy petition, Columbia had only $3.3 million in cash. This pooling of funds promoted efficient utilization of cash resources.
The second category of payments Columbia sought to make was $1.8 million in surcharges owed to GRI. GRI is a non-profit organization which manages research and development projects related to natural gas production and transportation. It does not provide any services directly to Columbia. GRI is financed predominantly through FERC-approved surcharges on gas delivered through regulated pipelines. Pursuant to this regulatory mechanism, each pipeline, including Columbia, collects a separately identified charge from its customers and then remits this money to GRI within fifteen days. See Gas Research Institute — Opinion No. 226, 28 FERC (CCH) ¶ 61,386, at 61,705 (1984). The Commission’s accounting rules require that monies collected on behalf of GRI be tracked in a separate account. See 18 C.F.R. Pt. 201, § 188.
In its FERC motion, Columbia also sought to pay upstream suppliers $15.3 million for gas delivered and transportation services provided to it in the two months prior to its filing for bankruptcy.
*1054 C. Decisions of the Bankruptcy and District Courts
Columbia argued to the bankruptcy court that the funds earmarked for customer refunds, GRI charges and upstream suppliers’ bills are not property of its bankruptcy estate because these funds are held in trust for its customers, GRI and upstream suppliers respectively. The Customers Committee and several local distribution companies supported Columbia’s position, while the Unsecured Creditors Committee and other individual unsecured creditors opposed it.
A bankruptcy estate includes all property of the debtor, but only to the extent of the debtor's equitable interest in such property. See 11 U.S.C. § 541(d) (1988). Therefore, if Columbia possessed only legal title to the monies at issue, these funds would not be an asset of the bankruptcy estate, and could be distributed.
The bankruptcy court first held that federal common law controlled whether Columbia had an equitable interest in the funds. Applying federal common law, the bankruptcy court found that the refunds Columbia received under FERC orders, as well as the GRI surcharges, are held in trust for its customers and GRI. Thus, Columbia has no equitable interest in these payments. The bankruptcy court attached minimal significance to Columbia’s commingling of the trust funds with general revenues because of the economic inefficiency of establishing numerous separate cash accounts.
Because the commingling precluded specifically tracing the trust funds, however, the bankruptcy court endorsed the lowest intermediate balance test. This principle assumes that money held in trust is withdrawn last from a commingled account. Once trust money is withdrawn, however, it is not replenished by subsequent deposits. Therefore, a beneficiary is entitled only to the lowest intermediate cash balance in a commingled account. To satisfy the obligations arising from customer refunds and GRI charges that Columbia received pre-petition, the bankruptcy court held that Columbia could distribute only the $3.3 million in cash it had when it filed for bankruptcy. The remaining pre-petition obligations would be unsecured debt. The bankruptcy court also found that Columbia could flow through to its customers and GRI all refunds and surcharges received post-petition.
The bankruptcy court denied Columbia’s request to pay upstream pipelines. The bankruptcy court distinguished these payments from the customers refunds and GRI charges in two respects: (1) the upstream payments were for goods and services; and (2) Columbia sought to distribute funds that it had not already collected from customers, but that it would recover in the future. The bankruptcy court also held that payments to the upstream pipelines were not necessary for a successful reorganization under 11 U.S.C. § 105(a) (1988).[2]
The district court reversed the disposition of the customer refunds and GRI payments, but affirmed the bankruptcy court’s decision with respect to the upstream pipeline payments. As a threshold matter, the district court held that state law controlled the treatment of the refunds and other monies. The district court examined the contracts between Columbia and its customers to discover whether the parties manifested the requisite intent to create an express trust and found that they had not. The district court also found Columbia’s commingling of the funds and the statutory requirement that interest be paid to be indicia of a debtor-creditor, rather than a trustee-beneficiary, relationship. The district court stated that even if federal common law controlled, the result would be the same.
The district court also rejected the theory that because Columbia was a mere conduit for the funds to reach the customers, it held the money in constructive trust for its customers. The court found the state law requirement of wrongful conduct absent in this case. It also found no identifiable trust property due to the commingling of funds. The district court agreed with the reasoning *1055 and conclusions of the bankruptcy court concerning the obligations owed to upstream suppliers.
Fourteen parties appealed the ruling of the district court. Additionally, FERC submitted an amicus curiae brief expressing its view that the customer refunds and the GRI surcharges are held in trust.
II. CUSTOMER REFUNDS
The principal issue on appeal is whether the customer refunds Columbia receives from upstream suppliers and passes on to its customers are property of Columbia’s bankruptcy estate as defined in 11 U.S.C. § 541(d). This inquiry turns on whether Columbia holds the refunds in trust for its customers. See infra part II.B. Before addressing the merits of this issue, however, we must determine whether this question should be resolved under federal common law or state law. We exercise plenary review over this legal question. See United States v. Med O Farm, Inc., 701 F.2d 88, 89 (9th Cir.1983); cf. Armotek Indus., Inc. v. Employers Ins. of Wausau, 952 F.2d 756, 760 n. 5 (3d Cir.1991) (which state’s law controls is a legal question subject to plenary review).

A.

It is axiomatic that federal law governs questions involving the interpretation of a federal statute. See Kamen v. Kemper Fin. Services, — U.S. -, -, 111 S.Ct. 1711, 1717, 114 L.Ed.2d 152 (1991). Therefore, it is clear, and the parties do not dispute, that federal law defines the parameters of section 541(d) of the Bankruptcy Code. This, however, is only the beginning of the inquiry. The determination that federal law applies does not inevitably require the application of a uniform federal rule. Applying federal law, courts may either fashion a uniform federal common law rule or adopt state law as the federal rule of decision. See id.; United States v. Kimbell Foods, Inc., 440 U.S. 715, 727-28, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979).
In Kimbell Foods, the Supreme Court outlined the analysis that determines whether uniform federal common law or state law should apply. The determination depends on the nature and importance of the government interest at issue and the effect of applying state law. Kimbell Foods, 440 U.S. at 727-28, 99 S.Ct. at 1458. To decide whether a national federal rule is necessary, courts should consider: (1) the need for a nationally uniform law; (2) whether incorporation of state law would frustrate specific objectives of the federal program at issue; and (3) the extent to which application of a federal common law rule would upset commercial expectations that state law would govern. See id. at 728-29, 99 S.Ct. at 1458-59; Adams v. Madison Realty & Dev. Inc., 937 F.2d 845, 856 (3d Cir.1991). Developing a federal common law rule is the exception rather than the rule. Federal law should coincide with the relevant state law unless state law would undermine the objectives of the federal statutory scheme and there is a distinct need for nationwide legal standards. See Kimbell Foods, 440 U.S. at 728, 99 S.Ct. at 1458.
Whether the customer refunds are held in trust for Columbia’s customers, and therefore excluded from the bankruptcy estate, sufficiently implicates important federal interests to warrant the application of federal common law. First, a national uniform law is necessary. The refunds at issue are created by an order of FERC. Their purpose is to compensate customers who have been charged excessive rates for natural gas. Private parties may not alter the refund orders by contract or otherwise. Indeed, the very purpose of the NGA is to supersede private contractual arrangements that interfere with the federal objective of ensuring that pipelines' charge only reasonable rates. Because the refunds arise directly from federal law and implement the central objective of the NGA, the property rights Columbia has in these customer refunds should not be subject to the vagaries of state trust law. See Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 310, 108 S.Ct. 1145, 1156, 99 L.Ed.2d 316 (1988) (“[U]niformity of regulation ... was an objective of the Natural Gas Act.”) (quoting Northern Natural Gas Co. v. State Corp. Comm’n of Kansas, 372 U.S. 84, 91-92, 83 S.Ct. 646, 651, 9 L.Ed.2d 601 (1963)).
*1056 Second, applying state law to determine Columbia’s property rights in the refunds would frustrate the NGA’s central purpose, to provide natural gas to the public at reasonable rates. See generally FPC v. Hope Natural Gas Co., 320 U.S. 591, 612, 64 S.Ct. 281, 292, 88 L.Ed. 333 (1944) (NGA is “plainly designed to protect the consumer interests against exploitation at the hands of private natural gas companies”). Trust law in numerous states imposes a constructive trust on funds only if wrongdoing-has resulted in unjust enrichment. See, e.g., Suttles v. Vogel, 126 Ill.2d 186, 127 Ill.Dec. 819, 823, 533 N.E.2d 901, 905 (1988); Roper v. Edwards, 323 N.C. 461, 373 S.E.2d 423, 424-25 (1988); Adams v. Jankouskas, 452 A.2d 148, 152 (Del.1982). Absent an express trust or affirmative wrongdoing, state law would not hold the refunds in trust on behalf of Columbia’s customers. Federal common law, however, provides a more expansive definition of an implied trust. Federal common law imposes a trust when an entity acts as a conduit, collecting money from one source and forwarding it to its intended recipient. See In re Penn Central Transp. Co., 486 F.2d 519, 523-27 (3d Cir.1973) (in banc), cert. denied, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974).
The Court of Appeals for the District of Columbia Circuit held that the pipelines overcharged the gas-consuming public. See Associated Gas Distrib., 893 F.2d at 355. To remedy this violation of the NGA, FERC ordered refunds to be paid by upstream suppliers to Columbia and further ordered Columbia to flow through these refunds to its customers and eventually to the public. If FERC intended that Columbia act as a conduit for the refunds to reach the public, but state law would not create a trust, FERC’s objective of ensuring that exploited customers receive the full amount of their refunds would be subverted by state law. Application of the federal common law rule is necessary to prevent such an outcome. Because the disposition of the refunds has the potential to enforce or undermine the dictates of a federal regulatory scheme, it is an issue “distinctively federal in character,” warranting application of federal common law. See United States v. Standard Oil Co., 332 U.S. 301, 305, 67 S.Ct. 1604, 1607, 91 L.Ed. 2067 (1947) (federal common law controls creation of liability for interference with government-soldier relationship); see also D’Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 447, 455-56, 62 S.Ct. 676, 678-79, 86 L.Ed. 956 (1942) (federal common law governs enforceability of promissory notes held by the Resolution Trust Corporation).
Application of state law not only would frustrate the purpose of the NGA, but also would warp the definition Congress intended to provide to the exclusion from the bankruptcy estate for equitable interests. See 11 U.S.C. § 541(d). The legislative history of section 541(d) makes clear that when a debt- or collects money on behalf of another, this money is held in constructive trust for the intended eventual recipient even absent any misconduct. See H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 368 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 5963, 6324.[3] Since in some cases state law is inconsistent with this definition, it must be displaced.
Finally, applying federal common law will not upset commercial expectations that state law would govern. Creditors cannot reasonably assume that state law will allocate various parties’ interests in federally created property rights. Moreover, this court already has developed federal common law concerning trusts. See Penn Central, 486 F.2d at 523-25. Therefore, our decision to apply federal common law will not require us to announce new doctrines, of substantive law unforeseen by the parties.
In In re Lehigh & New England Railway Co., 657 F.2d 570 (3d Cir.1981), this court applied federal common law to a factually similar case. There, shippers paid a single railway, which transported a shipment over tracks owned by numerous railroads. The compensated railroad maintained interline accounts to track the amounts it owed to other railways for use of their tracks, and settled these accounts at the end of each month. When a railway went into receivership, the railroads that were owed interline *1057 payments sought to be paid from the debtor’s mortgaged assets prior to both the secured and unsecured creditors, claiming that the money owed was held in trust for their benefit.
This court held that federal common law governed the disposition of the interline revenues. See Lehigh, 657 F.2d at 675-76. Several circumstances informed our decision. First, the interline funds arose from railroad operations, which are under the exclusive control of Congress. Id. at 575. Second, Congress had enacted comprehensive legislation, the Interstate Commerce Act, evidencing its intent to ensure the coordination of interline rail transportation. Id. Third, Congress regulated the rates charged by railroads through a federal agency, the Interstate Commerce Commission. Id. Finally, we observed that uniformity in the method of balancing interline accounts was necessary to allow our nation’s railways to operate as an integrated network. Id. Based on these four factors, this court concluded that the distribution of interline payments “implicate[s] wholly national concerns and therefore should be governed by federal law.” Id. at 576.
The same rationale applies here. The customer refunds arose from the sale of natural gas, which is regulated by Congress. Congress has enacted comprehensive legislation, the NGA, to regulate the gas industry, and it created a federal agency, FERC, to interpret and enforce this regulatory scheme. There is an even greater federal interest in this case than in Lehigh. The intricate system of accounts pipelines maintain to track refunds, the backbone of the federal scheme to regulate the gas industry, is mandated by federal law. See 18 C.F.R. Pt. 201, § 496 (1992). In contrast, the railroads in Lehigh voluntarily adopted the interline balance system.
The district court distinguished Lehigh because it found that regulation of the railroad industry was significantly more pervasive than regulation of the gas industry. The district court based this conclusion primarily on the fact that gas suppliers negotiate individualized rates with distributors while the Interstate Commerce Commission, at the time Lehigh was decided, set nationwide railroad rates and effectively precluded private contracts from establishing rates. See United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 338-39, 76 S.Ct. 373, 378, 100 L.Ed. 373 (1956); United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div., 358 U.S. 103, 109-10, 79 S.Ct. 194, 198, 3 L.Ed.2d 153 (1958).[4] The district court, however, ignored the rationale underlying these different procedures.
The NGA and the Interstate Commerce Act contain almost identical language about the legally permissible rates gas pipelines and railways respectively may charge. Compare 15 U.S.C. § 717c(a) (gas company rates “shall be just and reasonable”) with 49 U.S.C.A. § 1004(a) (1963) (repealed 1978) (railroads may charge only “just and reasonable rates”).[5] Although Congress utilized varying methods in the two industries to ensure that consumers are not overcharged, Congress did not thereby intend to regulate either the railroad or gas industry more stringently. The Supreme Court explained that Congress abrogated contractually negotiated rates in the railroad industry for reasons of administrative convenience:
The vast number of retail transactions of railroads made policing of individual transactions administratively impossible; effective regulation could be accomplished only by requiring compliance with a single schedule of rates applicable to all shippers. On the other hand, only a relatively few wholesale transactions are regulated by *1058 the Natural Gas Act.... [Therefore,] the Natural Gas Act permits the relations between the parties to be established initially by contract, the protection of the public interest being afforded by supervision of the individual contracts....
Mobile Gas, 350 U.S. at 338-39, 76 S.Ct. at 378. Moreover, FERC’s ability to regulate gas rates is not in any way limited by the existence of private contracts since all contracts are “subject of course to any overriding authority of the Commission.” Memphis Light, 358 U.S. at 114, 79 S.Ct. at 200. We therefore find no persuasive basis to distinguish Lehigh from this case.
Our decision to apply the federal common law of trusts is consistent with Columbia Gas Transmission Corp. v. Exclusive Natural Gas Storage Easement, 962 F.2d 1192 (6th Cir.), cert. denied, — U.S. -, 113 S.Ct. 659, 121 L.Ed.2d 585 (1992), upon which the Committee of Unsecured Creditors heavily relies. In that case, a gas pipeline appropriated an exclusive underground natural gas storage easement beneath private property pursuant to its eminent domain authority under the NGA. The NGA required the pipeline to compensate the landowners. The Exclusive Natural Gas court declined to create federal common law to calculate the value of the land. 962 F.2d at 1195-99. Instead, it held that the standard of valuation should incorporate the law of the state in which the condemned property is located. Id.
Exclusive Natural Gas does not stand for the broad proposition, as the Committee of Unsecured Creditors contends, that reference to state law doctrines to interpret sections of the NGA will not frustrate the goals of that statute. Rather, Exclusive Natural Gas addressed a specific section of the NGA, 15 U.S.C. § 717f(h). Section 717f(h), which governs the right of eminent domain, expressly provides that “[t]he practice and procedure in any [eminent domain] action or proceeding ... shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated.” Because the statutory language explicitly instructed federal courts to look to state “practice and procedure,” the court read the section “as raising a strong presumption” that state substantive law is also applicable. Exclusive Natural Gas, 962 F.2d at 1197. In contrast, neither the NGA nor the FERC order which creates the customer refunds mention application of state law. Therefore, no “strong presumption” in favor of state law exists in this case.
Additionally, the Exclusive Natural Gas court found that using state law valuation rules would not undercut the objectives of the NGA because the effect of the state law rule would be minimal. All parties agreed that the condemners had to pay for the easement they appropriated; the only disputed issue was how to calculate the value of this easement. The court found that any variance between a conceivable federal common law rule and the state law rule was too small and too speculative to rise to the level of frustrating the NGA. Id. at 1198. In this case, the parties disagree on who equitably owns the customer refunds, Columbia or its customers as the beneficiaries of a trust. This dispute does not implicate an ancillary issue of valuation, but determines whether or not many millions of dollars become part of Columbia’s bankruptcy estate. For all of these reasons, Exclusive Natural Gas is easily distinguishable from the present case.
B.
Having determined that federal common law governs whether the customer refunds are property of Columbia’s bankruptcy estate, we turn to the merits of that issue.[6] Applying federal common law, the bankruptcy court found that Columbia held these re *1059 funds in trust for its customers, and therefore excluded them from the bankruptcy estate. This holding was a legal conclusion, but was predicated on many factual findings. We exercise the same review over the bankruptcy court’s order as the district court. See Brown v. Pennsylvania State Employees Credit Union, 851 F.2d 81, 84 (3d Cir.1988). We accept the bankruptcy court’s factual findings unless they are clearly erroneous, but conduct a plenary review of the ultimate legal conclusion. See Meridian Bank v. Alten, 958 F.2d 1226, 1229 (3d Cir.1992).
The Bankruptcy Code provides that “all legal or equitable interests of the debtor” become property of the bankruptcy estate. See 11 U.S.C. § 541(a)(1). Courts have construed this definition broadly to include interests in causes of action, see, e.g., Esselen Assoc. v. Crysen/Montenay Energy Co., 102 B.R. 25, 28 (S.D.N.Y.1989), aff'd in relevant part and rev’d in part, 902 F.2d 1098 (2d Cir.1990); Amazing Enters. v. Jobin (In re M & L Business Mach. Co.), 136 B.R. 271, 275 (Bankr.D.Colo.1992), and common carrier certificates, see, e.g., Bernstein v. R.C. Williams, Inc. (In re Rocky Mountain Trucking Co.), 47 B.R. 1020, 1021 (D.Colo.1985); In re Brown Transp. Truckload, Inc., 118 B.R. 889, 893 (Bankr.N.D.Ga.1990). The Bankruptcy Code, however, exempts specific interests from a debtor’s estate. For example, section 541(d) provides:
Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate ... only to the extent of the debtor’s legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.
11 U.S.C. § 541(d).
All parties agree that a trustee has no equitable interest in funds it holds in trust. Indeed, that is the classic definition of a trust—the beneficiary has an equitable interest in the trust property while legal title is vested in the trustee. See Restatement (Second) of Trusts § 2 cmt. f (1959); 1 A.W. Scott & W.F. Fratcher, The Law of Trusts § 12.2 (4th ed. 1989). Therefore, if Columbia holds the customer refunds in trust, as it asserts, these refunds are excluded from Columbia’s bankruptcy estate and are immediately payable to its customers.
Congress clearly intended the exclusion created by section 541(d) to include not only funds held in express trust, but also funds held in constructive trust[7]:
Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, .and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in constructive trust for the person to , whom the bill was owed.
H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 368 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6324 (emphasis added). This insurance example evidences that Congress intended that when a debtor is a mere conduit for funds to travel from one party to another, it lacks’ an equitable interest in the monies. See T & B Scottdale Contractors, Inc. v. United States, 866 F.2d 1372, 1376 (11th Cir.) (“[t]he legislative history of 11 U.S.C.A. § 541 makes it clear that funds in the debt- or’s possession held for a third-party do not become part of the estate in bankruptcy”), cert. denied 493 U.S. 846, 110 S.Ct. 139, 107 L.Ed.2d 98 (1989).
Applying federal common law, this court previously has imposed an implied trust on funds held by a bankrupt debtor for another entity. See In re Penn Central Transp. Co., 486 F.2d 519, 523-27 (3d Cir.1973) (in banc), cert. denied 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974).[8] In Penn Central, rail *1060 roads that shipped goods traveled over railroad tracks owned by many different railways. To facilitate operations, the shipping railroad collected the entire charge from the customer, a portion of which it owed to the other railways whose tracks had been utilized. The railroad industry voluntarily created a complex system of accounting for these interline revenues and settled the balances in each interline account monthly.
Penn Central held that a trust relationship exists when the parties manifest an intention to create a trust. Id. at 524. The parties, however, need not employ any talismanic language — “failure to expressly designate the relationship as one of trust does not necessarily negate its existence.” Id.[9] Absent a document definitively establishing a trust relationship, we look to the language of the parties, their conduct, and other circumstances surrounding the transaction probative of their intent. See id. at 524-27.
The Penn Central court found that “the collecting railroad serves merely as a receiving and transmitting agent” as to the money it receives for the use of other railways’ tracks. Id. at 523-24. Therefore, we held, the “freight charges, when collected, are held in trust.” Id. at 524 (emphasis in original). We found significant that the interline balances did not represent payments by one railroad to another for services rendered. See id. at 528. The railroads owed one another money simply because they had collected fees on another’s behalf.
Another indicia of a trust emphasized in Penn Central was the absence of any provision for the payment of interest. Id. at 524. One party permitting another to use its money for a period of time in exchange for the payment of interest is the hallmark of a debtor-creditor relationship. Therefore, the absence of interest payments of interline balances counseled in favor of finding a trust.
Usually, the commingling of trust funds with general revenues also indicates a debt- or-creditor relationship. The Penn Central court found, however, that the “Commingling of monies has minimal significance in the extraordinary operations of interline railroads.” Id. at 525. Because it would be highly inefficient to segregate the numerous collections railroads received, little weight was accorded to this factor.
The Penn Central court found the trust principles it applied “appropriate to any industry,” see id. at 527, and we now apply them to the facts of this case. Before examining the extent of Columbia’s interest in the refunds, we must discuss how this interest is created. Typically, trust and debtor-creditor relationships are created by contractual agreement between two parties. Here, however, the refunds and the mechanism to distribute them were created by FERC, pursuant to its statutory authority under the NGA. Neither Columbia nor its customers could alter their respective interests in the refunds by contract. Because FERC unilaterally created the refunds, our characterization of the debtor’s interest in these refunds turns on the manifestations of FERC’s intent.[10]
FERC ordered Columbia to collect refunds from upstream suppliers and flow through these monies to its customers, local distribution companies, who in turn must flow through the funds to the gas-consuming public. See Order 528, supra, at 61,596 (“all refunds must be paid by upstream and downstream pipelines to the customers that actually paid the fixed charges”). When Columbia remits refunds to its customers, it is not paying them for goods or services rendered. *1061 Like the railroad in Penn Central, Columbia acts as a “receiving and transmitting agent,” or a conduit, for money upstream suppliers owe to overcharged consumers.[11]
Columbia did not maintain separate cash accounts for the various refunds it received. It did, however, meticulously track its refund obligations by maintaining over one hundred separate paper accounts. The bankruptcy court found, and no one challenges this finding as clearly erroneous, that segregating the numerous refunds would be a huge administrative burden and economically inefficient. Therefore, as in Penn Central, Columbia’s commingling of trust funds and general revenues has little significance concerning whether the refunds are held in trust.
To distinguish Penn Central, the Committee of Unsecured Creditors stresses that Columbia pays interest to its customers for the period during which it retains the refunds. Although a fixed rate of interest generally evidences a debt rather than a trust, unique circumstances make the fixed interest payments of minimal importance in this case. Interest payments indicate a debtor-creditor relationship because they are the usual contractually negotiated quid pro quo for a loan. Here, the NGA mandates the payment of interest, and FERC sets the interest rate. See 15 U.S.C. § 717c(e); 18 C.F.R. § 154.-67(c)(2). Columbia’s customers never consented to lend it money in exchange for a negotiated interest rate. Therefore, the payment of interest is not probative of a debtor-creditor relationship.
United Gas Pipe Line Company v. FERC, 657 F.2d 790 (5th Cir.1981), highlights the difference between FERC-ordered refunds and loans. In that case, pipelines challenged a FERC order to pay a specific interest rate, tied to the prime rate, on refunds. The pipelines argued that the interest rate should be based on the credit terms they could obtain in a competitive market. The court refused to accept any analogy between refunds and commercial loans, explaining, “[t]here is no suggestion that energy consumers, who ultimately pay the excessive charges, would jump at the opportunity to lend money to oil companies, and, in any case they never have that choice.” United Gas, 657 F.2d at 795.
Our conclusion that Columbia holds the customer refunds in trust is strengthened by In re United Milk Products Co., 261 F.Supp. 766 (N.D.Ill.1966). There, a federal regulatory program mandated that milk producers receive a uniform price for milk. To achieve this end, milk bottlers paid certain monies into a producer settlement fund, and manufacturers of milk products withdrew from the fund and passed this money through to their milk suppliers. United Milk, a milk product manufacturer, filed for bankruptcy and subsequently received payments from the fund, which it deposited in its general revenue bank account. The question before the court was whether this money should be deemed property of the bankruptcy estate.
The court in United Milk held that the fund payments were not property of the estate because the “debtor merely held them as a conduit, having an obligation to remit same to the producers.” United Milk, 261 F.Supp. at 768. The court more fully described the function of the debtor:
[T]he debtor has no independent right to the sums but is merely serving the function of a delivery agent, transferring money from the bottling handlers, through the Producer Settlement Fund, to the raw milk producers who are entitled to a uniform price whatever ultimate use is made of their product....
[T]he remaining unsecured creditors should not be permitted to share in monies in which the debtor has no direct financial interest and which it would not have been permitted to retain for its own use.
Id. Characterizing the creditors’ request to include the fund payments in the debtor’s bankruptcy estate as an attempt “to stop a continuing ‘motion picture’ at a single ‘frame,’ ” the court “looked to the end of the reel” and directed that the money be remit *1062 ted to the milk producers as directed by the original “script.” Id.
We find the reasoning in United Milk persuasive and follow it here. Just as the milk funds were created to ensure that producers receive a uniform price, the refunds here were ordered to ensure that customers are charged a just and reasonable rate. Most significantly, the statutory mechanisms of paying one entity which then forwards the money to the ultimate intended beneficiary are also identical.
Conceding that “[s]uperficially, United Milk resolves the questions against the [Creditors’] Committee,” the district court then distinguished that case. App. at 108. In United Milk, the government, through the Department of Agriculture, issued the check to the debtor. In this case, the money only passed through the hands of private parties.[12] This is a distinction without a difference. Columbia’s property rights in the refunds should not depend on the government’s role, if any, in routing this money to the proper recipient. Otherwise, these refunds would be part of the bankruptcy estate, but if the upstream pipelines paid the refunds to FERC, which then forwarded the money to Columbia for distribution, the money would be excluded from Columbia’s estate. We see no principled reason for such a distinction.
Applying federal common law, we hold that the customer refunds already received and those to be received are excluded from Columbia’s bankruptcy estate under section 541(d) of the Bankruptcy Code.
III. GRI CHARGES
Having outlined the federal common law test to determine whether monies are held in trust, we now apply the same analysis to the GRI surcharges.[13] GRI, a non-profit organization that conducts research and development projects for the gas industry, receives the vast majority of its budget through FERC-approved surcharges on gas delivered through regulated pipelines. The procedural mechanism to collect these surcharges is very similar to the method for distributing the customer refunds. Each pipeline, including Columbia, collects a separately identified charge from its customers and then remits this money to GRI. Pursuant to federal regulations, Columbia must track monies collected on behalf of GRI in a separate paper account. See 18 C.F.R. Pt. 201, § 188. GRI does not provide any products or services directly to Columbia, and Columbia does not owe GRI money until it actually collects the charges from its customers. Columbia merely collects money from its customers on behalf of GRI.
The argument for the GRI surcharges being held in trust is even stronger than the argument for the customer refunds being held in trust. FERC requires that GRI surcharges collected by Columbia be forwarded to GRI within fifteen days. See Gas Research Institute—Opinion No. 226, supra, at 61,705. Additionally, Columbia pays no interest to GRI during the short period of time it retains the money.[14] We conclude that Columbia acts as a conduit with respect tc GRI surcharges, and has no equitable interest in these funds.
IV. UPSTREAM PIPELINE PAYMENTS
Finally, we apply the constructive trust analysis to the payments Columbia seeks to make to upstream gas suppliers and transporters for pre-petition goods and services provided. Columbia purchases natural gas from upstream pipeline suppliers, includ *1063 ing appellants Ozark Gas Transmission System and Ozark Finance Corporation (collectively “Ozark”). It pays these suppliers based on their costs. The Transportation Cost Recovery Adjustment (“TCRA”) provision of Columbia’s tariff, on file with FERC, separately itemizes Columbia’s costs relating to upstream pipeline charges. The rate making process allows Columbia to recover its TCRA costs on a dollar-for-dollar basis from its customers and to retain a reasonable rate of return.
The obligations owed to upstream pipelines clearly are debts. Columbia owes the upstream pipelines money for goods and services they have provided to Columbia. Although Columbia’s customers pay the charges of the upstream suppliers dollar-for-dollar through Columbia’s rates, the chronology of the flow of money is totally different from the customer refunds and GRI surcharges. The bankruptcy court found Columbia pays upstream suppliers and subsequently recovers its costs from its customers.[15] Since Columbia pays the upstream suppliers before it receives money from its customers, Columbia does not act as a conduit or a collecting agent for the upstream suppliers. The upstream pipelines are in the same position as every other unsecured creditor.
Most retailers purchase a product from wholesalers and calculate the price at which they will resell the product to the public based on the wholesale cost plus a mark-up percentage. The fact that Columbia charges its customers based on its cost of purchasing natural gas plus a mark-up does not distinguish it from any other retailer. The upstream pipelines have supplied a product and services to a company that filed bankruptcy, and they must share the risk of bankruptcy with all other creditors.[16]
V. LOWEST INTERMEDIATE BALANCE TEST
Our decision that the customer refunds and GRI charges are held in trust does not automatically entitle Columbia’s customers and GRI to full payment of the amounts they are owed. To protect the interests of secured and unsecured creditors, beneficiaries of trust funds bear the burden of identifying and tracing their trust property. See Lehigh, 657 F.2d at 579.
When a trustee commingles trust funds with other monies in a single account, the lowest intermediate balance rule aids beneficiaries in tracing trust property. See 4 L. King, Collier on Bankruptcy ¶ 541.13, at 79-80 (1993); 5 A.W. Scott & W.F. Fratcher, The Law of Trusts § 518, at 634-36 (4th ed. 1989); Restatement (Second) of Trusts § 202 cmt. j (1959). The lowest intermediate balance rule, a legal construct, allows trust beneficiaries to assume that trust funds are withdrawn last from a commingled account. Once trust money is removed, however, it is not replenished by subsequent deposits. Therefore, the lowest intermediate balance in a commingled account represents trust funds that have never been dissipated and which are reasonably identifiable. Many courts of appeals have embraced the lowest intermediate balance test to determine trust beneficiaries’ rights in a commingled account. See, e.g., First Federal of Michigan v. Barrow, 878 F.2d 912, 916 (6th Cir.1989); Connecticut *1064 General Life Ins. v. Universal Ins. Co., 838 F.2d 612, 619 (1st Cir.1988); see also United States v. Banco Cafetero Panama, 797 F.2d 1154, 1159 (2d Cir.1986) (allowing government to choose to apply lowest intermediate balance test or another test to commingled account containing drug money).
We have never specifically accepted or rejected the lowest intermediate balance test. In Lehigh, however, the bank account that contained interline revenues held in trust had been completely dissipated. Lehigh, 657 F.2d at 579. We held that the railroads, the beneficiaries of the trust, could not identify any trust funds and therefore could not receive any payments before the other creditors. See id. The court in Lehigh acknowledged that beneficiaries lose all property rights in a commingled account when the account is completely dissipated. It requires only a narrow extension of this holding to conclude that a trust beneficiary also loses property rights in a commingled account to the extent that the account drops below the amount held in trust.[17] This is the essence of the lowest intermediate balance test.
To apply the lowest intermediate balance test to the customer refunds and GRI surcharges, we must analyze separately the refunds and surcharges that Columbia received pre-petition and those it received and will receive after the bankruptcy filing. When Columbia filed for bankruptcy, the $3.3 million in its general account was insufficient to satisfy its pre-petition obligations to its customers and GRI. The bankruptcy court found that this amount represents the lowest intermediate balance in the general account, and no party has challenged this finding as clearly erroneous. Therefore, Columbia may distribute only the $3.3 million on a pro rata basis to its customers and GRI to satisfy its pre-petition obligations. The remainder of its pre-petition obligations to its customers and GRI will be unsecured debt.
The bankruptcy court also found that no evidence suggests Columbia's post-petition refund or surcharge obligations were ever or will ever be greater than its cash balance in the general account. Therefore, assuming Columbia continues to track these obligations through its accounting system, Columbia may pass through future customer refunds and GRI surcharges to its customers and GRI respectively.
VI. CONCLUSION
For the foregoing reasons, we will reverse in part and affirm in part the order of the district court, and remand for further proceedings consistent with this opinion.

. Section 717c(a) provides:
All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas ... shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.

. The bankruptcy court also found that the customer refunds and GRI surcharges precluded from immediate distribution by operation of the lowest intermediate balance test were not necessary to rehabilitate Columbia. No party appeals this decision.

. See infra at 1058.

. The district court highlighted the special importance of railroads in our economy by noting the swift action taken by Congress and the President to avert a national railroad strike that threatened to paralyze the economy. See Settlement of the Railroad Labor-Management Disputes, Pub.L. No. 102-306, 106 Stat. 260 (1992). We have no reason to believe that Congress and the President would not be similarly concerned if a natural gas strike threatened to halt the supply of natural gas to residents and businesses throughout the nation. Therefore, we do not find this evidence probative of the relative extent of the federal interest in the two industries.

. Although the Customers Committee notes that regulation of railroads has changed significantly since Lehigh, the regulation in effect at the time this court decided Lehigh is relevant.

. The Committee of Unsecured Creditors devotes a significant portion of its brief to arguing that (1) die NGA does not modify the priority scheme of the Bankruptcy Code, which is based on equality of distribution for all creditors; and (2) no universal priority in favor of statutory schemes exists. See Committee of Unsecured Creditors Brief at 20-25. By so framing the issue, the Creditors Committee overlooks the dis-positive question. The issue before us is whether the refunds are property of the bankruptcy estate. If the refunds are excluded from the bankruptcy estate, the priority scheme is not implicated because it only controls how to divide assets contained in the bankruptcy estate.

. We do not reach the question whether section 541(d) excludes any interest other than funds held in trust.

. Penn Central is a pre-Bankruptcy Code decision, but its analysis of whether the interline balances were held in trust is identical to the inquiry the Code requires.

. The Committee of Unsecured Creditors emphasizes that Congress knows how to create a trust relationship. See, e.g., 7 U.S.C. § 499e(c)(2) (1988) (”[p]erishable agricultural commodities received by a ... broker ... shall be held by such ... broker in trust for the benefit of all unpaid suppliers”); 26 U.S.C. § 7501(a) (1988) (federal taxes withheld by employers are “held to be a special fund in trust for the United States”). Although our task would be much easier if the NGA explicitly stated that refunds are held in trust for overcharged customers, the absence of such express language is the beginning, not the end, of our inquiry. See Penn Central, 486 F.2d at 524.

. The district court erroneously concentrated on the contracts between Columbia and its customers. The district court stated: "The contracts explicitly detail the terms of billing and payments, yet significantly include no indication of a trust relationship.... [T]he refunds are based directly on these contracts.” App. at 104.

. At oral argument, FERC asserted that although the Commission had never taken a clear position, it believed it possessed authority to order the outstanding refunds to be paid by the upstream suppliers directly to the local distribution companies. This potential ability to bypass Columbia underscores that Columbia has no equitable interest in the refunds.

. The Creditors offer another distinction—that United Milk involves government grant money. This is simply incorrect. Although the Department of Agriculture managed the producer fund, the money was paid by private parties, the milk bottlers, and belonged not to the government but to the producers. See United Milk, 261 F.Supp. at 768.

. All parties assume that if federal common law governs the status of the customer refunds, the same body of law will determine whether the GRI charges and upstream payments are held in trust. We assume without deciding that this is true.

.Although the fact that Columbia does not pay interest on the GRI surcharges is not part of the bankruptcy or district court record, we will take judicial notice of this undisputed fact. See Fed. R.Evid. 201(b)(2).

. Although Ozark did not request that the bankruptcy court reconsider this factual finding, it now contends that the finding is clearly erroneous. To support this claim, Ozark points only to the testimony of Mr. Kettering, senior vice-president of Columbia. Mr. Kettering stated that “we collect from our customers dollar for dollar for the amounts that we, in turn, pay to some upstream pipeline.” App. at 243 (emphasis added). Although the phrase "in turn” intimates that the customers paid upstream costs before Columbia paid the upstream pipelines, Mr. Kettering was not responding to a question about the timing of the payments, and this isolated statement does not establish clear error. At oral argument, counsel for Ozark even conceded that "the testimony is not absolutely clear.” Transcript oí Oral Argument at 33. In any event, our ultimate conclusion, that the money owed to upstream pipelines is ordinary debt, would not change even if Columbia received the money from it customers and then forwarded it to the upstream pipelines.

. Since there is no concrete threat that the upstream pipelines will stop supplying gas to Columbia, we also reject Columbia's argument that paying upstream pipelines is "necessary or appropriate” to Columbia’s reorganization under 11 U.S.C. § 105(a).

. Our adoption of the lowest intermediate balance test necessarily reflects our disapproval of lower court decisions inconsistent with our holding. See, e.g., In re New York, Susquehanna and Western Railroad Co., 17 B.R. 905 (D.N.J.1981).